**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

LEON DAVIS, JR.,

Petitioner,

v. Case No. 8:24-cv-861-WFJ-CPT

SECRETARY, DEPARTMENT
OF CORRECTIONS, *et al.*,

Respondents.
_________________________________/

**ORDER**

In 2011, Leon Davis, Jr., was convicted of three counts of first-degree murder and sentenced to death. The convictions arose from a series of events at the Headley Insurance Agency in Lake Wales, Florida. After unsuccessfully challenging his convictions and sentences in Florida state court, Davis filed a federal petition for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1). Having carefully reviewed the petition, the response (Doc. 22), the reply (Doc. 28), and the voluminous state-court record (Docs. 23, 32), the Court concludes that Davis is not entitled to relief on any of his claims. Therefore, the petition is **DENIED**.[1]

[1] In a separate state-court case, Davis was sentenced to death for murdering two people during an attempted robbery of a BP gas station. *Davis v. State*, 207 So. 3d 177, 182 (Fla. 2016). Davis filed a federal habeas petition challenging those convictions as well. *Davis v. Sec'y, Fla. Dep't of Corr.*, No. 8:24-cv-860-WFJ-CPT (M.D. Fla.). Today, the Court resolves both petitions. Because the petitions raise several of the same claims, the Court's analysis of those overlapping claims is substantially the same in this order and the order entered in No. 8:24-cv-860-WFJ-CPT.

## I. Background

On direct appeal, the Florida Supreme Court summarized the extensive facts and procedural history of this case as follows:

> **The Events at Headley Insurance**
>
> The evidence introduced at Davis's trial revealed the following. Around 3 p.m. on December 13, 2007, Davis entered the Lake Wales location of the Headley Insurance Agency (Headley) with the intent to commit robbery. Davis was armed with a loaded .357 magnum revolver and equipped with duct tape, a cigarette lighter, gloves, a gasoline can that contained gasoline, and a lunch cooler to conceal the revolver.
>
> That afternoon, two Headley employees, Yvonne Bustamante (Bustamante) and Juanita Luciano (Luciano), were working. Bustamante, a licensed customer service representative, had worked at Headley for nine years. Luciano, a customer service representative, had worked at Headley for about three years. At the time, Luciano was twenty-four weeks pregnant. Upon entering the business, Davis locked the front door to prevent other customers from entering. He also placed duct tape over the lens of a security camera. Davis demanded money from the women, who initially refused to comply.
>
> Davis then forced the women to open the company's safe and cash box, which contained a combined amount of about $900. During the course of the robbery, Davis bound the women with duct tape, poured gasoline on them, and set them on fire. At 3:35 p.m., one of the women activated the office's panic alarm, which sent a signal to the alarm company. The Lake Wales Police Department was contacted one minute later.
>
> **Victims Seek Help; Davis Shoots Bystander**
>
> Bustamante and Luciano escaped the burning building and ran in separate directions seeking help. Bustamante eventually ran to the parking lot of the Headley building, and Luciano ran to a nearby restaurant, Havana Nights. As Bustamante tried to escape, Davis shot her in her left hand.
>
> By this time, concerned people who lived nearby had noticed the presence of smoke and walked to the area to investigate. These people, Fran Murray, Brandon Greisman, and Carlos Ortiz, were on the scene before emergency personnel arrived and became eyewitnesses to the aftermath of the robbery. Another eyewitness, Evelyn Anderson, was a Headley customer who arrived

at Headley while the robbery was in progress. At trial, these eyewitnesses testified about the events at Headley, including their various encounters with Davis.

Fran Murray (formerly Fran Branch) testified that at the time of the robbery, she was sitting outside of her apartment and saw smoke nearby. She walked toward the smoke to investigate its source. Around the same time, her neighbors, including Greisman and Ortiz, also noticed the smoke. They all proceeded to walk toward the smoke to investigate.

As Murray approached the smoke, she realized that it was coming from the Headley building. She then saw Bustamante, who was yelling for help and whose body was burning. Murray observed that Bustamante was wriggling her wrists to free them of a thick gray tape, and that Bustamante's "skin was falling off of her." "And, just, she wasn't screaming, but she wasn't talking lightly either. She was just trying to get away."

As Greisman approached the building, he saw a woman whose body was burning, and he went to help her. At the same time, Greisman saw Davis walking towards them, and he originally thought that Davis was coming to help the distressed woman. Greisman made eye contact with Davis, who pulled a gun out of the cooler that he was carrying and pointed it at Greisman. Greisman tried to get away, but Davis shot him in the face, hitting him in the nose. The gunshot caused profuse bleeding and removed the tip of Greisman's nose.

Murray, who was still in the vicinity, heard popping sounds and saw Greisman fall to the ground and catch himself with his hands. She saw Davis walk away and place a gun into his lunch cooler. Murray then assisted Greisman, who was getting up from the ground.

Carlos Ortiz also heard the popping sounds as he approached the Headley building. As he got closer to the building, Greisman was walking back toward him with a bloody face. Greisman told Ortiz that he had been shot, and Ortiz saw Davis behind Greisman. Ortiz saw a part of the gun that Davis was carrying, and he saw Davis stick his hand into the lunch cooler. Ortiz made eye contact with Davis while trying to help Greisman as well as make sure that Davis was not following them. Greisman walked back to his home, and Ortiz and Murray assisted him while awaiting the arrival of emergency help.

Evelyn Anderson, a Headley customer, arrived at Headley to pay her insurance bill during the time that the robbery was taking place. Anderson

parked her sport utility vehicle in front of Headley, and her teenage granddaughter and infant grandson remained inside the vehicle. When Anderson tried to open the front door of the Headley building, she discovered that it was locked. Anderson walked to the side of the building to try and determine why she was unable to enter the building during normal business hours. While walking, she noticed that smoke was coming out of the building. Anderson also heard popping sounds, and shortly thereafter, Davis walked out of the building and placed the cooler under his arm. Anderson asked Davis what was happening. Davis continued walking away but responded that there was a fire in the building. Davis then walked to his vehicle, a black Nissan Altima, that was parked at a vacant house nearby. Davis got inside of the vehicle and drove away.[1]

> [fn. 1] Earlier that afternoon, Murray saw a black car sitting on a back street near a vacant house. After the robbery, she noticed that the car was not there. Additionally, Ortiz saw Davis walk away from the scene and towards the back of the vacant house. Ortiz also noticed a black Nissan that he had not seen parked in that location before. Ortiz saw the Nissan being driven away, but he did not see the driver.

Shortly thereafter, Anderson came into contact with Bustamante. Anderson received a minor burn on her hand when she touched Bustamante, who was screaming for help and was severely burned. Bustamante walked towards Anderson's vehicle, and Anderson's granddaughter, who was seated in the front seat of the vehicle, ran away from the vehicle after seeing Bustamante's burning body. Bustamante walked to the open vehicle door and climbed inside the vehicle. Anderson encouraged Bustamante to get out of the vehicle because the paramedics were on the way. Bustamante got out of the vehicle and leaned on the hood.

By this time, Murray had finished attending to Greisman, and she returned to Headley to see if she could provide further help. Murray saw Bustamante leaning against Anderson's SUV. Murray described the scene as follows:

> She [Bustamante] was um, screaming she was hot. And that her skin was rolling off of her body at this time. It was disgusting. You could smell the burnt skin and flesh. And she was screaming she was really, really hot and she was thirsty. And so I ran across the street at that time to Havana Nights, which was a restaurant, a Cuban restaurant, across the street of Headley, off of the other corner of Phillips, and got a cup of ice water in a to go cup.

Murray returned to Bustamante with the cup of water, and Bustamante sipped from the cup while awaiting the arrival of emergency personnel. Murray talked with Bustamante, and Murray described their conversation as follows:

> I introduced myself as Fran and she introduced herself as Yvonne. We sat there talking a minute and she started to say—and I gave her water. And, um, she said that she didn't understand how anybody would rob her, she didn't have any money. And that her kids, please pray, I'm not going to make this Fran. And I told her that I would get to the hospital if I could to see her, if it was allowed and that I would keep her in my prayers, that with God everything was possible. She wanted to talk about her children. And I cannot remember clearly if I asked her who did it, or if she was just talking. And she said that it was a black gentleman, and that he should be on video tape. She then started crying again and said she loved her babies very much, and she doesn't understand how anybody could do this to her.

Bustamante also told Murray that she had been bound with tape, doused with gasoline, pushed into a bathroom, and set on fire.

In the meantime, Luciano escaped the Headley building and ran to the nearby Havana Nights restaurant. The restaurant's owner, Jaidy Jiminez, heard a loud boom, and shortly thereafter, Luciano ran into the restaurant. Although Luciano was a Havana Nights customer, she was so badly burned that Jiminez did not recognize her: "I saw a woman that was naked, burned, um, burned from head to toe, no shoes on, or any clothes on, just underwear. But I couldn't recognize her."

Luciano asked for help and begged Jiminez to close the door because "he" was coming. Jiminez helped Luciano, whom she realized was pregnant, sit down. Additionally, other people inside the restaurant were trying to call 911 and to assist Luciano. Luciano asked what was taking so long for help to arrive and stated that she could not feel her baby moving. Jiminez tried to reassure her. It was during this time that Murray came into the restaurant asking for water, and Jiminez provided it to her. Jiminez walked outside the restaurant to get help, and she saw the severely burned Bustamante. Once the paramedics arrived and began to assist Bustamante, Jiminez told them that another injured woman, Luciano, was inside of the restaurant.

**Emergency Personnel Response**

Emergency dispatches increased in their sense of urgency as the initial report of a fire gave way to additional reports of injuries and a shooting. Lt. Joe

Elrod of the Lake Wales Police Department first encountered Greisman, who explained that he was shot while attempting to help a woman whom he heard screaming for help and soon discovered was on fire.

Lt. Elrod determined that Greisman's injuries were not life-threatening, and because emergency medical personnel were on the way to assist Greisman, he proceeded to the Headley building. When Lt. Elrod arrived at Headley, emergency medical personnel were already on the scene and were assisting Bustamante in the parking lot. Lt. Elrod observed Bustamante's severe burns, and he estimated that the burns covered about eighty percent of her body. Lt. Elrod immediately understood the gravity of Bustamante's injuries, and he decided not to wait until later to obtain Bustamante's statement. Lt. Elrod testified: "I knew she was going to die, so I tried to get information from her on who did it to her." "I asked her who did it to her. And she told me it was Leon Davis. And then I asked her, how she knew him. And she said that she knows him and that he was [a] prior client of theirs in the Insurance Company." Bustamante explained that Davis tried to rob them, and when they did not give him money, he threw gasoline on them and set them on fire. When they tried to run, Davis continued to throw gasoline on them.

Lt. Elrod then located Luciano inside of the Havana Nights restaurant. When he walked inside the restaurant, he saw Luciano, who was "obviously pregnant," sitting down. Lt. Elrod characterized Luciano's burn injuries as even worse than Bustamante's. Lt. Elrod went outside and told emergency personnel that another victim needed help who was in even worse condition than Bustamante. He then began dispatching the name "Leon Davis" to law enforcement and conducting routine duties at the crime scene.

Paramedic John "Chip" Johnson and emergency medical technician Ernest Froehlich were the first emergency medical personnel to arrive on the scene. Upon arrival, they first saw Bustamante, who was in the parking lot and leaning on Anderson's SUV. Johnson observed: "the skin, everywhere I could see it, it was peeling back, and she had suffered major burns. Also she had darkened hands, and a further injury to her left hand, [t]hat was my observations at that time." Froehlich testified that Bustamante "looked like she had burns all over her body, hair singed off, most of her clothing was burned off, skin was hanging off her back and buttocks."

Froehlich was present when Lt. Elrod asked Bustamante if she knew who the perpetrator was, and he overheard Bustamante say "Leon Davis." Johnson also heard Bustamante state that Davis was the perpetrator, although he was unable to clearly hear Bustamante say Davis's first name. Anderson also heard Bustamante identify Davis as the perpetrator.

After initially assisting Bustamante, Johnson went to Havana Nights to assist Luciano. When Johnson entered the restaurant, he noticed water on the floor and saw Luciano, who was severely burned and "basically naked." There was a plastic substance on her wrists, neck area, and feet. Luciano, who was conscious, breathing, and able to talk clearly, told Johnson that she was pregnant and that while working in her office, someone poured gasoline on her and set her on fire. Luciano also told Johnson that her wrists were burning, and Johnson went to the ambulance to get sterile water to alleviate her pain.

By this time, additional emergency medical personnel were dispatched to the scene. Upon arrival, paramedic George Bailey assumed primary responsibility for Luciano's care, and Johnson went back to the parking lot to continue assisting Bustamante. Luciano was conscious and able to respond to questions. She explained to Bailey "that there had been a robbery, at the business where she was at, she had been tied up or bound with tape, and had gasoline poured on her and had been lit on fire." Bailey did not ask her who harmed her, but Luciano told him that the person was a man and that she knew who it was. Luciano also told Bailey that she was twenty-four weeks pregnant. Bailey estimated that eighty percent of Luciano's body was burned with second- and third-degree burns.

Both Bustamante and Luciano were airlifted to the Orlando Regional Medical Center for treatment in the burn unit. Luciano underwent an emergency caesarean section, during which she gave birth to her son, Michael Bustamante, Jr.[2] Although detectives went to the hospital in hopes of interviewing Bustamante and Luciano, the severity of their injuries prevented the detectives from ever meeting with them.

[fn. 2] Yvonne Bustamante's brother, Michael Bustamante, was in a relationship with Luciano and was the father of baby Michael.

Michael lived for three days after his emergency delivery. He died as the result of extreme prematurity. Bustamante lived for five days, and Luciano lived for three weeks. Autopsies of both women revealed that they died from complications of thermal burns due to the fire. According to the medical examiner, Bustamante suffered burns that covered eighty to ninety percent of her body. Luciano suffered burns that covered about ninety percent of her body. Additionally, the autopsy of Bustamante revealed bullet fragments from the gunshot to her left hand, although the gunshot was not a cause of her death.

## Events after the Robbery

After leaving the scene, Davis went to a branch of the Mid Florida Credit Union, where he was an established customer. At 4:19 p.m., less than forty-five minutes after the alarm was activated at Headley, Davis walked into the credit union to make a cash deposit. Jessica Lacy, the teller who assisted Davis, was familiar with him as a customer and knew Davis by name. Davis deposited $148 in cash into his account that previously had a balance of $5.33. While processing Davis's transaction, Lacy observed that Davis's face was bloody and appeared to have scratches and marks on the nose, lip, and chin. The credit union branch manager, Valerie Dollison, was also working that afternoon. She did not personally know Davis, but she heard someone call him "Leon."

Davis also went to the house where his brother, Garrion Davis (Garrion), and Garrion's girlfriend, Melissa Sellers, resided.[3] Garrion testified that on the afternoon of December 13, "my brother came to my house. He wanted to—he needed some soap to wash his face. And he went outside my house and washed his face. I noticed he had a scratch on his face. He told me he had robbed somebody." Garrion testified that Davis also came inside the house and took a shower. Garrion estimated that Davis was at the house for ten to fifteen minutes.

[fn. 3] By the time of trial, Sellers and Garrion were married.

Sellers, who was at home with Garrion at the time, testified about Davis's visit to their house that afternoon. Sellers wished Davis, whose birthday was the next day, a happy early birthday. She estimated that Davis was at her house for ten minutes or less, and although she was not certain whether he had taken a shower, she knew that he had been in their bathroom. When Davis left, Sellers observed that Garrion's demeanor had changed. Garrion seemed upset and was teary-eyed.

Later, Davis went to a friend's home, where he used the cell phone of a woman named Fonda Roberts. Roberts was unable to hear Davis's conversation, which lasted a couple of minutes. When Davis was finished using the phone, he started to hand the phone to Roberts and then pulled it back from her. Davis then erased the number that he called. Roberts observed that at the time, Davis was driving a black vehicle.

**Davis Turns Himself In**

As the afternoon progressed, a massive investigation began. Davis's photograph was shown on television as media began to report the events at Headley, and Davis's family and friends became increasingly aware of Davis's status as a suspect in the day's events. Davis's family and friends frantically began trying to locate him in hopes that they could convince him to turn himself in safely.

That evening, Davis called his sister, Noniece DeCosey, and asked her to come and pick him up near a McDonald's. Their mother, Linda Davis, accompanied DeCosey to meet Davis. DeCosey drove them to a Circle K convenience store to meet Davis's and DeCosey's other sister, India Owens, and family friend Barry Gaston. Upon arrival, Davis walked up to Gaston, hugged him, and said: "I hurt someone." When Gaston asked Davis what he did, Davis said that he did not know. Davis and his mother got into a car with Owens and Gaston.

Gaston, a former law enforcement officer, helped facilitate Davis turning himself in at the Polk County Sheriff's substation. Gaston testified that on the way to the substation, Davis laid his head on his mother's lap in the backseat of the car and cried and sobbed. Davis again said that he hurt somebody, but Gaston told him not to say anything more. Davis was turned over to the Polk County Sheriff's Office without incident. Davis was later transported from the Sheriff's Office substation to the Bartow Air Base for further processing.

A number of people with whom Davis came into contact later in the day testified at trial that Davis appeared to have some sort of injury to his nose. The crime scene technician who photographed Davis after he was taken into custody and a law enforcement officer who interacted with Davis upon his transfer to the Bartow Air Base both testified that Davis appeared to have either scratches or a burn on his nose. Additionally, Davis's sister, Noniece DeCosey, saw a red mark on Davis's nose that could have been a burn.

That night, a black Nissan Altima was found at the Lagoon nightclub in Winter Haven. Law enforcement officers were dispatched to the location, and the car was seized pending a warrant to search the car's interior. Searches conducted in the vicinity of where the car was located, in particular to look for a firearm, did not reveal any additional evidence. The following day, after the search warrant was signed, law enforcement conducted an interior search of the Altima. Davis's driver license was found inside the car.

Davis was later tried for three counts of first-degree murder (Bustamante, Luciano, and baby Michael), one count of attempted first-degree murder (Greisman), one count of armed robbery, and one count of first-degree arson.

**The Guilt Phase**

The State's theory at trial was that Davis, a man driven by mounting financial pressures, planned the robbery of Headley, a business with which he was familiar. Davis's business relationship with Headley dated back to 2004, and as reflected in various records, Davis's insurance needs were primarily handled by Bustamante. The State introduced evidence that established a timeline of events leading up to the robbery, including Davis's actions on the day of the robbery. A summary of this evidence follows.

In the months leading up to the robbery, Davis experienced increasing financial difficulty. Davis, who at the time was married to his wife Victoria, was primarily responsible for the family obligations, including the mortgage payment on their home. At the time, Davis and his wife had two cars: a blue Nissan Maxima owned by Davis, and a black Nissan Altima owned by Victoria. Both vehicles were insured under policies written by Headley. In June 2007, during a visit to the Mid Florida Credit Union, Davis became aware that the amount of the automatic debit from his account for his insurance coverage had been increasing over time. Davis was also informed that his account was overdrawn and became irate.

Unable to afford insurance for both cars, Davis and Victoria removed the license plate from the Maxima, canceled the car's insurance policy, and relied solely on the Altima for transportation. The couple was also unable to afford cell phone service during this time. Victoria had been working, but she became pregnant and was forced to stop working because of pregnancy complications.

**Davis's Plan to Rob Headley**

Davis's plan to rob Headley began to coalesce in early December. By this time, the couple had reached the limits on their credit cards, and the mortgage payment was delinquent. One week before the robbery, Headley customer Virginia Vazquez saw Davis at Headley. She first saw Davis in the parking lot looking in the back of a black car. Then, Davis went inside and began talking with Bustamante. Vazquez and her husband waited inside the insurance agency for fifteen to twenty minutes before Bustamante finished talking with Davis. Vazquez later recognized Davis from news coverage as the person she saw during her visit to Headley.

Davis's preparation for the robbery also involved acquiring various items that he would need in order to carry out the robbery, including a gun and ammunition. On December 7, 2007, six days before the robbery, Davis went to visit his cousin, Randy Black. Davis told Black that he needed a gun for personal protection because he was going to travel to Miami. Black owned two guns, including a recently purchased Dan Wesson .357 magnum revolver. Black showed Davis both guns, and Davis opted to purchase the .357 magnum for around $200. Black also gave Davis .38 caliber bullets which were compatible with the .357 magnum. Davis and Black fired the revolver, which was operating normally. Later, Davis showed his mother the revolver. Davis told her that he got the revolver from Black and that he and Black fired it.[4]

> [fn. 4] After Black realized that law enforcement was looking for Davis, he immediately contacted law enforcement to advise that he recently sold Davis a gun. Black also provided law enforcement with two .38 caliber bullets and the receipt documenting his original purchase of the gun.

**Davis's Actions on the Day of the Robbery**

The evidence introduced at trial also established a detailed timeline of Davis's actions on the day of the robbery, which included a visit to Walmart to purchase supplies that he would use later that day. On the morning of December 13, Victoria Davis last saw her husband at about 6 a.m. Before 7 a.m., Davis took his son, who had spent the previous night with Davis and Victoria, home to the boy's mother, Dawn Henry. His son's birthday was that day.

Davis then went to the Lake Wales Walmart, where surveillance video and still photographs showed him making three separate purchases around 7 a.m. The first purchase included a cap, long-sleeved shirt, and soft, orange lunch cooler. Davis's second purchase was a pair of gloves, and the third purchase was a Bic cigarette lighter. All of the purchases were cash transactions.

While at Walmart, Davis spoke with the store manager, Mark Gammons, and a store employee, Jennifer DeBarros. Gammons testified that Davis approached him and asked where gloves were located in the store. When Gammons saw Davis's picture on the news that evening, he realized that he had seen Davis in Walmart that morning. Walmart employee Jennifer DeBarros had known Davis for more than ten years and was a family friend. DeBarros testified that on the morning of December 13, she talked with

Davis during his visit to Walmart. DeBarros talked with Davis about his son's birthday.

Some time after leaving Walmart, Davis drove to the home of his sister, India Owens. Davis then accompanied Owens to take her car for repairs and pick up a rental car. They later went to pick up some furniture, and they stopped at a restaurant for lunch. Davis seemed agitated while eating lunch.

Video surveillance showed that Davis left the restaurant at 1:38 p.m. Davis and Owens then delivered the furniture to Owens's house. During that time, Owens noticed that Davis began acting strangely, obsessively locking doors in the house. Davis also asked for a piece of duct tape but did not say why he needed it. A short time later, Davis left Owens's house. Although Davis's son had a birthday party at school that afternoon, Davis did not attend. Davis entered the Headley building sometime around 3 p.m.

**The Investigation**

In addition to evidence surrounding the events at Headley, their aftermath, and Davis's behavior leading up to and including the day of the robbery, the State introduced evidence regarding various aspects of the investigation.

The expansive crime scene investigation spanned several days, and the numerous crime scene photographs entered into evidence depicted a gruesome series of events that began inside the Headley building and continued outside. The exterior photographs depict the entrance to Headley, the parking lot, Anderson's vehicle, and the trail of bloody footprints and burnt skin that led from the Headley building to Havana Nights. Anderson's SUV was smeared with blood on both sides of the hood and was marked by blood stains on the vehicle doors and in the passenger side interior.

The interior photographs captured the damage in various areas of the Headley building, including fire damage in the office area, the storage area, and the extensively damaged bathroom. Among the widespread fire damage to and debris in the Headley building, the interior crime scene photographs revealed the presence of blood, a severely burnt chair, two cigarette lighters (one of which was identified as a Bic lighter), burnt duct tape, a burnt plastic gasoline can, an open cash box that contained only coins, an open and empty safe, a bloody alarm key pad, and burnt surveillance equipment. The photographs also showed bullet holes in a wall, a door, and an exterior shed door. A bullet was retrieved from the shed floor.

Detective Jeff Batz, an arson investigator, detected the odor of gasoline inside the Headley building, and noted that it was particularly strong near the rear of the building. Batz identified three areas of fire origin inside the Headley building: a chair located near the front door, the storage room, and the bathroom. Batz testified as follows: "Three-points of origin, separate in nature[,] neither one of them had connections with each other, directly through flame impingement. They all started with an open flame type device and accelerant was used on all three areas."

The investigation also included an examination of the seized Nissan Altima. When the car's floor mats were analyzed for the presence of an accelerant, a certified accelerant detection K-9 alerted to the presence of accelerant on the driver's floor mat and the passenger rear floor mat.

Several days after the robbery, a search warrant was executed at Davis's home. Although trial testimony revealed that Davis was responsible for the yard work at his home and that he kept a lawn mower and a gasoline can in the garage, law enforcement located only the lawn mower. No gasoline can was found at Davis's home.

The gun used in the Headley crimes was never recovered. However, the rifling characteristics of the projectiles retrieved from the crime scene and from Bustamante's hand were determined to be consistent with the rifling characteristics of handgun manufacturer Dan Wesson, the manufacturer of the .357 magnum revolver that Davis bought several days before the robbery.

**The Verdict and the Penalty Phase**

On February 15, 2011, the jury convicted Davis of six counts: the first-degree murders of Bustamante, Luciano, and baby Michael; the attempted first-degree murder of Greisman; armed robbery; and first-degree arson. The penalty phase began two days after the jury rendered its guilty verdicts, wherein the State sought to prove seven aggravating circumstances. In addition to testimony from Davis's probation officer and the medical examiner, the State presented victim impact testimony from Bustamante's and Luciano's families.

Angela Bryson, the State's first witness, was Davis's felony probation officer. Bryson testified that Davis was placed on probation for grand theft on July 6, 2007. Davis was still on probation at the time of the Headley crimes. Dr. Stephen Nelson, the medical examiner, returned to the stand as the State's second witness. Dr. Nelson provided further testimony regarding the injuries sustained by Bustamante and Luciano:

> They would begin to feel pain immediately upon the fire starting to consume their skin. The burns that are present on these victims is approximately 80 to 90% of the body surface area. It is third and fourth degree burns. First-degree burn is a sunburn, a second-degree burn is a blistered sunburn, a third-degree would be a full thickness burn that goes through the full thickness of the skin, involves nerve endings. And fourth degree burns would largely be charred, burns where the skin is charred. So, the first-degree and second-degree burns, I think we have all had sunburns, we know how painful those are. If we have a sunburn, a second degree burn that has fluid filled vessel that pops, that's painful. The third-degree burn, again, it involves the degree of thickness that is burned through skin. And the third-degree burns are painful in that they produce the burning sensation itself, up to a point at which point the nerve endings under their skin are damaged. And then there is no more pain or nerve signal that is sent from the fire. However[,] in addition to the burn being produced by the gasoline, whatever it is that is on their skin that's flaming, the subsequent treatment for a burn is also painful.

Dr. Nelson also testified that both women would have been capable of feeling pain in some areas even if their nerve endings were destroyed in others. Both women, who were so severely injured that an IV could not be inserted into their veins, would have experienced pain when intraosseous catheters were inserted into their leg bones to receive medication. The women would have stopped experiencing pain once they received the medication or were medically induced into a coma, but they could have been conscious of what was going on until that point.

After the State's penalty phase presentation, Davis offered evidence in mitigation and alleged the existence of two statutory mitigating circumstances and fifteen non-statutory mitigating circumstances.

Multiple witnesses testified that Davis's childhood was marked by abuse. When Davis was eight years old, he was sexually assaulted by another child. The following year, a woman named Ms. Clark moved into the family home as a roommate. Sometime later, Davis and his brother Garrion moved out of the family home and began staying with Clark, who was an alcoholic and was physically and verbally abusive. Clark routinely beat Davis, and on one occasion, she caused severe injuries to the back of his body by beating him with an extension cord. Clark taunted Davis with physical and verbal abuse because he was bullied by other children, and she also hit him with water

hoses and punched him in the chest. Family members observed physical injuries such as welts, bleeding, and open scabs and sores on Davis's body.

Additionally, Davis suffered from ongoing depressive and mood episodes, in part due to the bullying he suffered from elementary school through high school. In middle school, Davis began talking about suicide, and his mother encouraged him not to take his life. Davis received mental health counseling for two to three months, but his problems continued. After graduating from high school, Davis joined the United States Marine Corps. However, the following year, Davis was involved in a vehicle accident and he revealed that he intentionally crashed the vehicle that he was driving. Pursuant to a recommendation for an administrative separation, Davis was discharged from military service.

Although Davis was only about one year old when his father moved out of the family home, his father remained a part of Davis's life. While growing up, Davis and his siblings were separated and placed in foster care, but Davis remained close with his mother and siblings. Davis's sister, India Owens, described him as compassionate, loving, and selfless. After Davis's discharge from the military, he met a woman named Dawn Henry, with whom he had a son. The child was born with Down Syndrome. Henry testified that while she had trouble adjusting to being a mother of a child with special needs, Davis immediately accepted their son and was consistently present in his life.

Around the time of the robbery, Davis was depressed and upset that he could not afford to do anything for his son's birthday. Davis's mother testified that when Davis purchased the revolver shortly before the robbery, she was concerned that Davis might use it to commit suicide.

### Jury Recommendations and *Spencer* Hearing

At the conclusion of the penalty phase, the jury unanimously recommended that Davis be sentenced to death for the murders of Bustamante and Luciano. By a vote of eight to four, the jury recommended that Davis be sentenced to death for the murder of baby Michael. The Court subsequently held a *Spencer*[5] hearing at which both parties presented additional argument but did not present additional evidence.

[fn. 5] *Spencer v. State*, 615 So.2d 688 (Fla. 1993).

## Sentencing

The trial court sentenced Davis to death for the murders of Bustamante and Luciano. In its sentencing order, the trial court found the existence of six aggravating circumstances as to the murders of both women: (1) the capital felony was committed by a person previously convicted of a felony and on felony probation (some weight); (2) the capital felony was a homicide and was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification (CCP) (great weight); (3) the defendant was contemporaneously convicted of another capital felony or a felony involving the use or threat of violence to the person (very great weight); (4) the capital felony was committed while the defendant was engaged in the commission of, or attempt to commit, or in flight after committing or attempting to commit any robbery or arson (moderate weight); (5) the capital felony was committed for pecuniary gain (little weight); and (6) the capital felony was especially heinous, atrocious, or cruel (HAC) (great weight).[6] The trial court found a seventh aggravating circumstance as to the murder of Bustamante; the felony was committed for the purpose of avoiding or preventing a lawful arrest (some weight). The court also evaluated this aggravating circumstance with respect to the murder of Luciano but rejected it as not proven.

> [fn. 6] The trial court noted that improper doubling did not occur with the trial court's finding of both murder in the course of a robbery and pecuniary gain, because the jury convicted Davis of separate offenses of armed robbery and first-degree arson.

The trial court also considered two statutory mitigating circumstances. Due to Davis's prior felony convictions, the trial court rejected as statutory mitigation his argument that he had no significant prior criminal history. However, the trial court did find that the crime was committed while Davis was under the influence of extreme mental or emotional disturbance (little weight). As nonstatutory mitigating circumstances, the trial court found the following: (1) the defendant was the victim of bullying throughout his childhood (slight to moderate weight); (2) the defendant was the victim of sexual assault as a child (slight to moderate weight); (3) the defendant was the victim of both physical and emotional child abuse by a caretaker (moderate weight); (4) the defendant was the victim of overall family dynamics (very little weight); (5) the defendant served in the United States Marine Corps (very little weight); (6) the defendant had a history of being suicidal, both as a child and as an adult (slight weight); (7) the defendant was diagnosed with a personality disorder (slight weight); (8) the defendant had a history of depression (slight weight); (9) stress the defendant was dealing

> with at the time of the incident (little weight); (10) the defendant was a good person in general (very slight weight); (11) the defendant was a good worker (very slight weight); (12) the defendant was a good son, good sibling, and good husband (very slight weight); (13) the defendant was a good father to a child with Down Syndrome (moderate weight); (14) the defendant exhibited good behavior during the trial and other court proceedings (very slight weight); and (15) the defendant exhibited good behavior while in jail (little weight).
>
> The trial court overrode the jury's recommendation of death and imposed a sentence of life imprisonment for the murder of Michael.

*Davis v. State*, 207 So. 3d 142, 147-58 (Fla. 2016).

The Florida Supreme Court affirmed Davis's convictions and sentences. *Id.* at 175. Next, Davis moved for postconviction relief in state court under Florida Rule of Criminal Procedure 3.851. *Davis v. State*, 383 So. 3d 717, 731-32 (Fla. 2024). He received an evidentiary hearing on several ineffective-assistance claims. *Id.* at 732. The postconviction court ultimately rejected all of Davis's claims in a written order, and the Florida Supreme Court affirmed the denial of relief in a lengthy opinion. *Id.* at 743. This federal habeas petition followed. (Doc. 1).

## II. Standards of Review

### A. AEDPA

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694; *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

### B. Exhaustion of State Remedies; Procedural Default

A federal habeas petitioner must exhaust his claims in state court before presenting them in his federal habeas petition. 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). The exhaustion requirement is satisfied if the petitioner fairly presents his claim in each appropriate state court and alerts that court to the federal nature of the claim. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). A fundamental miscarriage of justice occurs in an extraordinary case where a constitutional violation has probably resulted in the conviction of someone who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). To establish cause for a procedural default, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner demonstrates prejudice by showing that "there is at least a reasonable probability that the result of the proceeding would have been different" absent the constitutional violation. *Henderson*, 353 F.3d at 892.

**C. Ineffective Assistance of Counsel**

Davis alleges ineffective assistance of counsel. Ineffective-assistance-of-counsel claims are analyzed under the test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a showing of deficient performance by counsel and resulting prejudice. *Id*. at 687. Deficient performance is established if, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id*. at 690. However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

Davis must show that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. To demonstrate prejudice, Davis must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Obtaining relief on a claim of ineffective assistance of counsel is difficult on federal habeas review because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (internal quotation and citations omitted); *see also Pooler v. Sec'y, Dep't of Corr.*, 702 F.3d 1252, 1270 (11th Cir. 2012) ("Because we must view Pooler's ineffective counsel claim—which is governed by the deferential *Strickland* test—through the lens of AEDPA

deference, the resulting standard of review is doubly deferential."). "The question [on federal habeas review of an ineffective assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

## III. Discussion

### A. Constitutional Challenge to AEDPA

Before addressing Davis's claims, the Court pauses to consider a preliminary matter. As explained above, AEDPA "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Felkner v. Jackson*, 562 U.S. 594, 598 (2011). Davis argues that the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), renders AEDPA deference unconstitutional. (Doc. 28 at 6-24). *Loper Bright* eliminated "*Chevron* deference," the doctrine that required federal courts to defer to a federal agency's reasonable interpretation of a statute that "is silent or ambiguous with respect to the specific issue at hand." 603 U.S. at 379-80, 412. Following *Loper Bright*, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority," as required by the Administrative Procedure Act. *Id.* at 412. Davis contends that, in light of *Loper Bright*, a federal habeas court cannot defer to a state court's interpretation of the federal constitution because federal courts must maintain their independent judgment over federal cases. (Doc. 28 at 6-24).

"Every court to address this claim disagrees with this view and has concluded *Loper Bright* has limited applicability and does not implicate federal habeas practice." *Piper v. Att'y Gen. for S. Dakota*, 174 F.4th 1070, 1076 (8th Cir. 2026) (collecting cases). In an unpublished decision, the Eleventh Circuit joined this consensus, rejecting the argument that "*Loper Bright* . . . rendered AEDPA deference unconstitutional." *Bates v. Sec'y, Fla. Dep't of Corr.*, No. 25-12588, 2025 WL 2305211, at *1 (11th Cir. Aug. 1, 2025). The court explained that "*Loper Bright* is an interpretation of the Administrative Procedure Act—not the Constitution." *Id.* Moreover, "[t]o the extent that the [Supreme] Court discussed the Constitution at all in *Loper Bright*, it did so only to provide historical background for the general principle that Article III courts must 'exercise [their] judgment independent of influence from the political branches.'" *Id.* (quoting *Loper Bright*, 603 U.S. at 385). According to the Eleventh Circuit, "*Loper Bright*'s observations about the relationship between the Article III judiciary and the 'political branches'" had "no bearing" on "the deference that AEDPA requires federal habeas courts to give state courts' decisions." *Id.*

For these reasons, the Court rejects Davis's argument that *Loper Bright* implicitly overturned AEDPA deference. *See, e.g.*, *Green v. Streeter*, No. 5:24-cv-1501-MHH-GMB, 2025 WL 3990174, at *10 (N.D. Ala. June 3, 2025) ("*Loper Bright*'s limited holding does not touch AEDPA deference."), *adopted by* 2025 WL 3721690 (N.D. Ala. Dec. 23, 2025). Unless otherwise noted, the Court evaluates Davis's claims under AEDPA's "highly deferential" standard of review.[2] *Felkner*, 562 U.S. at 598.

[2] Davis alternatively contends that the Court should adopt Justice Stevens's interpretation of AEDPA deference in *Williams v. Taylor*, 529 U.S. 362 (2000). (Doc. 28 at 24-25). "In *Williams*, Justice O'Connor

### B. Ground One—Failure to Seek a Change of Venue

Davis argues that trial counsel provided ineffective assistance by failing to move for a change of venue. (Doc. 1 at 28). According to Davis, counsel "should have requested a change of venue due to significant pretrial publicity [in Polk County] that was overwhelmingly prejudicial to" him. (Doc. 28 at 29). Davis points to the "substantial" coverage of the Headley crimes in the "initial days and weeks" after the murders, noting that the case "was featured heavily in the Florida newspapers that cover events in Polk County as well as various news networks and internet sources." (*Id.* at 37). The coverage continued after Davis's first trial ended in a mistrial.[3] (Doc. 1 at 32). When the mistrial was declared, Bustamante's mother threw her purse at Davis and one of his attorneys, and Bustamante's father jumped the rail dividing the gallery from the attorneys. (Doc. 23-6 at 27-28).[4] Footage of the incident was played on local television. (*Id.* at 47-48).

One week after the mistrial, the court held a hearing to discuss next steps. (*Id.* at 48). Although neither side had moved to change venue, the court expressed "concerns as to whether we can get a jury" in Polk County and indicated that it had begun researching

---

delivered the section of the majority opinion interpreting § 2254(d)(1) [the provision establishing AEDPA deference], but Justice Stevens delivered the section applying the *Strickland* test to the facts at hand." *Phoenix v. Matesanz*, 233 F.3d 77, 80 n.1 (1st Cir. 2000) (citing *Williams*, 529 U.S. at 367). Because Justice Stevens's interpretation of AEDPA deference did not command a majority in *Williams*, the Court cannot follow it here.

[3] The mistrial resulted from the testimony of EMT Ernest Froehlich, who stated that Bustamante "raised up on the stretcher, and emphatically stated, Leon Davis, without any doubt in her mind, without any hesitation in her voice." (Doc. 28 at 50 n.15).

[4] When citing the state-court record (Docs. 23, 32), the Court uses the page numbers assigned by CM/ECF. The electronic record submitted by Respondents does not appear to contain Volume 99 of the record on direct appeal. (Doc. 23-10). For ease of reference, the Court attaches a copy of the missing Volume to this order.

other counties where the retrial could be held. (*Id.* at 48-50). The court "hope[d]" a jury could be impaneled in Polk County but wanted to "be realistic and be prepared to go" if that proved impossible. (*Id.* at 50). Davis's lead counsel, Robert Norgard, said that he would "almost rather get a jury [in Polk County] unless we end up with people who are living in a cave that don't know about [the case]." (*Id.*) Norgard also pointed out that if venue were changed, "every person in this room [would] have to find a place where they [could] live for six weeks," and he would need to arrange childcare for his "two kids in school." (*Id.*)

After the hearing, Davis moved to keep the case in Polk County. (*Id.* at 64). According to the motion, both Davis and his attorneys wished to try the case in Polk County. (*Id.*) Davis argued that (1) "a fair and impartial jury was able to be selected in Polk County [during the first trial] in less time than usual in cases of this nature," (2) the jury "appeared to deal very effectively with the emotional aspects of this case," (3) the "publicity generated during the [first] trial" would not "preclude [Davis] from getting a fair and impartial jury in Polk County," and (4) the "media accounts" of the first trial presented some "matters favorable to [Davis]," including "cross-examination of the State's witnesses." (*Id.* at 64-66). In short, Davis argued that if an "adequate number of jurors" were "brought in," a "fair and impartial jury" could be "obtained in Polk County." (*Id.* at 66). Ultimately, the case remained in Polk County, and a jury was impaneled in January 2011 after two weeks of voir dire. (*Id.* at 1760-934; Doc. 23-7; Doc. 23-8).

Norgard, Davis's lead counsel, testified at the postconviction evidentiary hearing about his decision to forgo a venue motion. By the time the hearing took place, Norgard

had handled "somewhere between 35 and 40 death penalty trials." (Doc. 32-5 at 335). He claimed that "childcare arrangements" had "nothing to do with" his desire to try the case in Polk County. (*Id.* at 361). Instead, his decision-making was influenced by several strategic considerations. First, after the mistrial, Norgard had received "unsolicited" feedback from "one of the jurors" that the jury "actually thought we were winning." (*Id.* at 354). Second, Norgard "felt very confident that [the trial court] would probably exclude any[] [prospective jurors] who knew about the trial and mistrial." (*Id.*) Third, if he became "uncomfortable" with the prospective jurors who "came up in the second trial," Norgard "would have considered and probably moved for" a "change of venue." (*Id.* at 355). Finally, Norgard had "been practicing" in Polk County since 1985, and he believed he had "a pretty good feel for the types of people" who lived in the area. (*Id.* at 369).

The Florida Supreme Court ultimately rejected Davis's claim that counsel should have moved for a change of venue. *Davis*, 383 So. 3d at 734-35. The court began by noting that "pretrial publicity is normal and expected in certain kinds of cases, and that fact standing alone will not require a change of venue." *Id.* at 734 (quoting *Griffin v. State*, 866 So. 2d 1, 12 (Fla. 2003)). The court then held that Davis had not "demonstrated deficient performance." *Id.* It highlighted Norgard's testimony "about his lengthy practice history in Polk County, and his familiarity with and understanding of the county's residents." *Id.* According to the court, Norgard "made a strategic decision not to pursue a change of venue and preferred to try the case in Polk County because of his extensive practice experience there." *Id.* Norgard knew, however, that "he could have moved for a change of venue during jury selection if selecting a jury in Polk County had proven difficult." *Id.* Based on

this testimony, the court found that Norgard "offered sound strategic reasons for wanting to keep the trial in Polk County for the second trial." *Id.* (internal quotation marks omitted). Those reasons, the court explained, were "informed by decades of trial experience in Polk County." *Id.*

Although "the failure to show deficient performance [was] determinative of this ineffective assistance claim," the Florida Supreme Court also addressed the prejudice prong. *Id.* at 734-35. It found that Davis's "prejudice argument fail[ed] because he [had] not shown that the trial court would or should have granted a motion for change of venue." *Id.* at 735. According to the court, "[w]here the record is clear that there was no difficulty in selecting a jury, the mere fact that the trial court considered the possibility of a change of venue does not establish prejudice." *Id.* Here, the parties "were able to select a jury without difficulty, and as a result, counsel did not deem a change of venue necessary." *Id.* Because an impartial Polk County jury was impaneled with relative ease, there was no "reasonable probability that a change of venue motion would have been granted." *Id.*

The Florida Supreme Court reasonably concluded that counsel's performance was not deficient.[5] "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. A strategic choice "will be held to have been ineffective assistance only if it was so patently unreasonable that no competent attorney would have chosen it." *Dingle v. Sec'y for Dep't*

---

[5] Because this claim can be disposed of on the performance prong, the Court need not address prejudice. *See Michael v. Crosby*, 430 F.3d 1310, 1319 (11th Cir. 2005) ("[W]e need not address the prejudice prong if we find that the performance prong is not satisfied.").

*of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007). "Because *Strickland* allows for a range of strategic choices by trial counsel, so too is there considerable leeway for state courts to determine the reasonableness of those choices." *Franks v. GDCP Warden*, 975 F.3d 1165, 1176 (11th Cir. 2020). Accordingly, to prevail on his ineffective-assistance claim, Davis "would have to show that no reasonable jurist could find that his counsel's performance fell within the wide range of reasonable professional conduct." *Id.*

Davis fails to overcome the "doubly deferential" standard of review required by *Strickland* and AEDPA. *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011). A reasonable jurist could agree that counsel's decision to forgo a change of venue rested on "sound strategic reasons." *Davis*, 383 So. 3d at 734. At the time of trial, Norgard—Davis's lead attorney—was a highly experienced criminal defense lawyer who had practiced in Polk County since 1985 and handled multiple death penalty cases. (Doc. 32-5 at 335, 369). In addition to his practice experience, Norgard served for fifteen years as chairman of the "death penalty committee" for the Florida Association of Criminal Defense Lawyers, lectured on death penalty topics at various seminars, and for over a decade published "a Florida Supreme Court death penalty update . . . summar[izing] . . . all the death penalty cases out of the Florida Supreme Court." (*Id.* at 337, 339-40). Where, as here, a court "examin[es] the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger." *Chandler v. United States*, 218 F.3d 1305, 1316 (11th Cir. 2000); *see also Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir. 1998) ("Our strong reluctance to second guess strategic decisions is even greater where those decisions were made by experienced criminal defense counsel.").

As the Florida Supreme Court explained, counsel drew on his "decades of trial experience in Polk County" when he chose to forgo a change of venue. *Davis*, 383 So. 3d at 734. Several strategic considerations supported this decision. Among other factors, counsel (1) believed he had "a pretty good feel for the types of people" who lived in Polk County, (2) "felt very confident that [the trial court] would probably exclude any[] [prospective jurors] who knew about the trial and mistrial," (3) thought that "a fair and impartial jury was able to be selected in Polk County [during the first trial] in less time than usual in cases of this nature," and (4) knew that he could seek a "change of venue" if he became "uncomfortable" with the prospective jurors who "came up in the second trial." (Doc. 23-6 at 64-66; Doc. 32-5 at 354-55, 369). Given these strategic considerations, a fairminded jurist could agree that "some reasonable lawyer" would try to keep the case in Polk County. *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995); *see also Fleming v. Kemp*, 748 F.2d 1435, 1447 (11th Cir. 1984) (counsel "exercised reasonable professional judgment in deciding not to pursue a change of venue" based on his belief that "Lanier County was a good location for the trial and that his considerable experience trying cases there, many as prosecutor, enabled him to choose a 'favorable' jury"); *Huls v. Lockhart*, 958 F.2d 212, 214-15 (8th Cir. 1992) (defense counsel "were not ineffective for failing to seek a change of venue" where they based their decision on "their familiarity with the county, its citizens, and the particular jurors").

Davis resists this conclusion, arguing that counsel's "primary reason for not changing venue was simply a matter of convenience"—specifically, his need to make childcare arrangements if the case were tried outside Polk County. (Doc. 28 at 38). To be

sure, counsel informed the trial court that if venue were changed, "every person in this room [would] have to find a place where they [could] live for six weeks," and he would need to arrange childcare for his "two kids in school." (Doc. 23-6 at 50). But counsel testified at the postconviction evidentiary hearing that the decision to forgo a change of venue "had nothing to do with childcare arrangements." (Doc. 32-5 at 361). Counsel clarified that he "mentioned the part about the logistics of having to get childcare simply just to give us enough heads up to work that out if [the trial court] did change venue." (*Id.*) On this record, the Florida Supreme Court reasonably concluded that counsel's decision-making rested on strategic concerns rather than the inconvenience of having to make childcare arrangements if venue were changed. *See Brumfield v. Cain*, 576 U.S. 305, 314 (2015) (AEDPA requires "substantial deference" to state-court factual findings).

**C. Ground Two—Bustamante's Dying Declaration**

Davis argues that the trial court violated the Confrontation Clause when it admitted Bustamante's dying declaration. (Doc. 1 at 42-43). As explained above, Lt. Elrod encountered a severely burned Bustamante in the Headley parking lot. *Davis*, 207 So. 3d at 150. He "knew she was doing to die," so he "tried to get information from her on who did it to her." *Id.* Lt. Elrod testified: "I asked her who did it to her. And she told me it was Leon Davis. And then I asked her, how she knew him. And she said that she knows him and that he was [a] prior client of theirs in the Insurance Company." *Id.* Three other witnesses overheard this exchange. *Id.* Bustamante was also heard to say, "[P]lease pray, I'm not going to make this." *Id.* at 149. She passed away five days after the robbery. *Id.* at 151.

According to Davis, the admission of Bustamante's dying declaration violated *Crawford v. Washington*, 541 U.S. 36 (2004). (Doc. 28 at 42). *Crawford* held that the Confrontation Clause generally bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." 541 U.S. at 53-54. Here, as the Florida Supreme Court explained, "the State introduced, as a dying declaration, out-of-court testimonial statements of the declarant, Bustamante. Bustamante was unavailable to testify at trial, and Davis lacked a prior opportunity to cross-examine her." *Davis*, 207 So. 3d at 160. Thus, Davis argues that Bustamante's dying declaration was inadmissible under *Crawford*. (Doc. 28 at 42).

The Florida Supreme Court disagreed. It "join[ed] the overwhelming majority view that the dying declaration exception remains viable post-*Crawford*." *Davis*, 207 So. 3d at 162. Under *Crawford*, the government may introduce an unconfronted out-of-court statement if it fits a historically recognized common law exception. *See Crawford*, 541 U.S. at 54 (holding that the Sixth Amendment incorporates "exceptions" to the confrontation requirement "established at the time of the founding"). *Crawford* itself did "not decide . . . whether the Sixth Amendment incorporates an exception for testimonial dying declarations." *Id.* at 56 n.6. The Court recognized, however, that "[t]he existence of that exception as a general rule of criminal hearsay law cannot be disputed." *Id.* Later, in *Giles v. California*, the Court noted that dying declarations—statements "made by a speaker who was both on the brink of death and aware that he was dying"—were "admitted at common law even though they were unconfronted." 554 U.S. 353, 358 (2008). But *Giles*

did not address whether dying declarations survived *Crawford*. *Id.* at 358-59. Thus, at the time of Davis's direct appeal (and to this day), the dying declaration exception "remains in High Court limbo." *Woods v. Cook*, 960 F.3d 295, 300 (6th Cir. 2020).

After surveying the relevant caselaw, the Florida Supreme Court "reject[ed] [Davis's] invitation to abrogate Florida's dying declaration exception." *Davis*, 207 So. 3d at 164. It held that the "unique nature and purpose of the dying declaration exception . . . justifies its continuing utility and validity as an exception to the rule against hearsay." *Id.* at 162. The court cited "the extraordinary nature of the dying person's ability to speak to the circumstances that placed her in that grave position, and quite possibly to identify the perpetrator and ensure that the one who commits murder is held accountable." *Id.* at 163. It also rejected Davis's "challenge to the reliability" of dying declarations, reasoning that "the certain expectation of almost immediate death will remove all temptation to falsehood and enforce as strict adherence to the truth as the obligation of an oath could impose." *Id.* at 164 (quoting *Mattox v. United States*, 146 U.S. 140, 152 (1892)).

Having found that "*Crawford* did not abrogate the dying declaration exception in Florida," the Florida Supreme Court addressed "whether Bustamante's statements to Lt. Elrod constituted a dying declaration." *Id.* at 165. The court found that they did. *Id.* at 166. A deceased's statement qualifies as a dying declaration if he "appreciated his condition as being that of an approach to certain and immediate death." *Id.* at 165 (internal quotation marks omitted). Here, "Bustamante, whom medical personnel testified was oriented and alert at the scene, was aware of her extensively burned body." *Id.* at 166. "Assessing her own deeply grave condition, Bustamante told Fran Murray that she did not think [she] was

going to survive." *Id.* Because "Bustamante clearly expressed her belief that she was not going to survive," the court held that her statements were "properly admitted . . . as a dying declaration." *Id.*

The Florida Supreme Court did not unreasonably apply clearly established federal law when it rejected Davis's Confrontation Clause claim. "'[C]learly established Federal law' for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014). Thus, "it is not 'an unreasonable application of' 'clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." *Knowles*, 556 U.S. at 122. "The Supreme Court has reiterated, time and again, that, in the absence of a clear answer—that is, a holding by the Supreme Court—about an issue of federal law, we cannot say that a decision of a state court about that unsettled issue was an unreasonable application of clearly established federal law." *Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1288 (11th Cir. 2012).

As explained above, the "Supreme Court has not clearly established that admission of a testimonial dying declaration violates the Confrontation Clause." *Brown v. Att'y Gen. of California*, 650 F. App'x 434, 436 (9th Cir. 2016); *see also, e.g.*, *Woods*, 960 F.3d at 300 ("Since *Crawford*, the U.S. Supreme Court has acknowledged the potential permissibility of [the dying declaration] exception to the Confrontation Clause. Under these circumstances, we cannot fault state courts for continuing to do what the U.S. Supreme Court has acknowledged they may be able to do after *Crawford* and what the Court itself did before *Crawford*."); *Martin v. Fanies*, 365 F. App'x 736, 738-39 (8th Cir.

2010) (ruling that the Minnesota Supreme Court did not violate clearly established federal law when it held that dying declarations were permissible under *Crawford*). To the contrary, "in *Crawford* and again in *Giles* . . . , the Supreme Court hinted that dying declarations may fall within an exception to the constitutional bar against testimonial hearsay." *Walker v. Harry*, 462 F. App'x 543, 545 (6th Cir. 2012). Moreover, "a majority of states" have "interpret[ed] . . . *Crawford* as allowing dying declarations to be an exception to the Confrontation Clause." *State v. Williamson*, 249 A.3d 478, 492 (N.J. 2021) (collecting cases). Given the state of the law, it was not objectively unreasonable for the Florida Supreme Court to hold that dying declarations are permissible under *Crawford*.

Likewise, the Florida Supreme Court reasonably applied federal law when it found that Bustamante's statements qualified as a dying declaration. For a testimonial statement to be admissible at common law as a dying declaration, the declarant had to be "on the brink of death and aware that [s]he was dying." *Giles*, 554 U.S. at 358. Here, the evidence showed that "(1) Bustamante received extensive burns of the second, third, and fourth degree; (2) she was burned over at least eighty percent of her body; (3) her flesh was falling off of her body; (4) she was in severe pain; and (5) the severity of her burns was indicative of a high probability of death." *Davis*, 207 So. 3d at 165. Moreover, Bustamante "was aware of her extensively burned body," telling a witness that "she did not think [she] was going to survive." *Id.* at 166. As noted above, Bustamante succumbed to her injuries five days later. *Id.* at 151. Under these circumstances, a fairminded jurist could conclude that Bustamante was "on the brink of death and aware that [s]he was dying" when she identified Davis as the perpetrator. *Giles*, 554 U.S. at 358; *see also Woods*, 960 F.3d at 301 (state

court reasonably applied federal law by admitting dying declaration made ten days before declarant passed away); *Labon v. State*, 868 So. 2d 1222, 1223 (Fla. 3d DCA 2004) (dying declaration properly admitted where declarant "knew of his grave condition and imminent death" and ultimately passed away eleven days after statement).

**D. Ground Three—Photopack Identifications**

Within days of the incident at Headley Insurance, "eyewitnesses Greisman (shooting victim) and Ortiz offered out-of-court identifications of Davis after viewing his photograph in a photopack (also known as a photographic lineup)." *Davis*, 207 So. 3d at 166. Both witnesses later "identified Davis in court during their trial testimony." *Id.* Davis argues that the photopacks shown to Greisman and Ortiz were "impermissibly suggestive," rendering their out-of-court and in-court identifications "inherently unreliable." (Doc. 28 at 59-60). Thus, according to Davis, the admission of the identifications violated his rights to due process and a fair trial. (*Id.* at 59).

Greisman and Ortiz "were each shown a photopack that was printed on a piece of letter-sized paper and contained six photographs." *Davis*, 207 So. 3d at 167. The two photopacks were identical except for Davis's placement. (Doc. 23-4 at 425, 436). "The photographs were divided into two rows, with three photographs on each row." *Davis*, 207 So. 3d at 167. After viewing the photopacks, the trial court explained: "It's . . . six black males, all of them have short hair, all of them have skin tones that are fairly similar. To me, they all look about the same age group, and I would have guessed mid 20s." (Doc. 23-4 at 899). "The lower left corner of each photograph contained an identifying number ranging from one through six." *Davis*, 207 So. 3d at 167. In addition, "[b]elow the bottom

row of photographs were six sets of book-in numbers, each of which corresponded to one of the photographs." *Id.* "Each of the numbers contained between seven and eleven digits and was printed in small font." *Id.* "Davis's book-in number contained the number 2007, and the other photographs each contained the number 93 or 94, representing the year that the photograph was taken." *Id.*

On direct appeal, Davis argued that the photopacks were unduly suggestive because his photograph alone contained a book-in number of 2007, the year the crimes took place. (Doc. 23-12 at 123-25). According to Davis, this book-in number was "an arrow pointing to" him. (*Id.* at 126).

The Florida Supreme Court rejected this claim, concluding that "the out-of-court identifications made by Greisman and Ortiz were not unnecessarily suggestive." *Davis*, 207 So. 3d at 168. The court began by surveying the cases Davis cited involving "the use of a date in a photographic lineup." *Id.* (citing *Henderson v. United States*, 527 A.2d 1262 (D.C. 1987); *State v. Davis*, 504 A.2d 1372 (Conn. 1986); *Brown v. Commonwealth*, 564 S.W.2d 24 (Ky. Ct. App. 1978)). The court distinguished these cases on the ground that, in each, "the year or the date was placed *on* the suspect's photograph," whereas the book-in numbers in Davis's photopacks were placed *beneath* "the entire set of photographs." *Id.* The court explained that *Brown* was "especially demonstrative of an unnecessarily suggestive photographic lineup." *Id.* The identification procedure in that case was described as follows:

> The seven photographs shown [to the eyewitnesses] were mug shots from the files of the Jefferson County Police Department. In each photograph a board was suspended from around the neck of the individual. Each board contained

> information for identification purposes. In the case of Brown and Hill [the defendants], each board contained the abbreviation "ROB" and the date "November 17, 1975." In the other five photographs, the boards did not contain the robbery date of November 17, 1975, nor were any two dates the same. Only one of the other five photographs contained the abbreviation "ROB."

*Brown*, 564 S.W.2d at 26.

According to the Florida Supreme Court, "[t]hese facts, which include[d] the unequivocal use of the date of the crime and the abbreviation 'ROB' within the suspects' photographs, demonstrate[d] an unnecessarily suggestive photograph." *Davis*, 207 So. 3d at 168. By contrast, "Davis's facts [fell] far short of these." *Id.* The court explained that "[t]he photopacks shown to Greisman and Ortiz contained, beneath the entire set of photographs, six sets of book-in numbers that corresponded to the photographs above." *Id.* Moreover, "[t]he numbers were printed in small font and were innocuous," and both "Greisman and Ortiz quickly identified Davis's photograph." *Id.* Thus, the court concluded that the book-in numbers did not "render[] the photopacks unnecessarily suggestive." *Id.* Therefore, the trial court did not err in admitting Greisman and Ortiz's out-of-court and in-court identifications. *Id.*

This ruling was reasonable. The constitution imposes "a due process check on the admission of eyewitness identification, applicable when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime." *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012). "Out-of-court identifications are examined for due process violations using a two-part test: The court must first decide whether the [procedure] was impermissibly suggestive, and if it was

suggestive the court must then determine whether the identification procedure created a substantial likelihood of misidentification." *United States v. Smith*, 459 F.3d 1276, 1294 (11th Cir. 2006). "When determining whether a photo array is unduly suggestive, [courts] consider the size of the array, the manner of its presentation, and the details of the photographs in the array." *United States v. Perkins*, 787 F.3d 1329, 1344 (11th Cir. 2015).

Davis cannot show that the Florida Supreme Court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. 86, 103. To the contrary, a reasonable jurist could find that the photopacks shown to Greisman and Ortiz were not unduly suggestive. As the Florida Supreme Court noted, the book-in numbers were "printed in small font" and placed "beneath the entire set of [six] photographs." *Davis*, 207 So. 3d at 168. Moreover, the officer who conducted the photographic lineup testified that (1) Greisman did not "say anything at all about" the book-in numbers, and (2) Ortiz did not "appear" to "look[]" at the numbers and did not "say anything" about them. (Doc. 23-4 at 577, 877). Similarly, the trial judge stated that although he had "been a judge for 15 and a half years," he "didn't pick up on" the fact that the numbers "signifie[d] year[s]" until "it was pointed out to [him]." (*Id.* at 900). "Absent any evidence that the witness[es] [were] influenced by the arrest dates," a reasonable jurist could conclude that the mere inclusion of the dates did not render the photopacks "unduly suggestive." *Kubat v. Thieret*, 867 F.2d 351, 358 (7th Cir. 1989); *see also United States v. Love*, 692 F.2d 1147, 1150 (8th Cir. 1980) (holding that "dates on the photographs did not increase the chances of misidentification" because the witness "testified that she hadn't

noticed them"); *Steese v. State*, 960 P.2d 321, 333 (Nev. 1998) ("[Defendant] argues that the photographic line-up shown to [the witness] was impermissibly suggestive because his photograph was the only one which was labeled with a 1992 booking date. However, this court has held that mere disparity in the dates on photographs is not sufficient to invalidate a photographic line-up." (internal quotation marks omitted)).

Davis points to several other alleged "indicia of suggestibility," but none rendered the photopacks unduly suggestive. (Doc. 28 at 72). For example, Davis points out that the photographs were all "black-and-white." (*Id.*) But there is no reason to believe that this feature of the photographs increased the likelihood that the witnesses would identify Davis. *See United States v. Smith*, 967 F.3d 1196, 1204 (11th Cir. 2020) (photopack not unduly suggestive where "photographs all had similar backgrounds and were in black and white"); *United States v. Haile*, No. 2:22-cr-20629, 2023 WL 4118568, at *3 (E.D. Mich. June 22, 2023) (fact that "photo lineup was in black-and-white" did not make lineup "unduly suggestive"). Davis also notes that only he and one other person wore "gray shirts while the others wore white." (Doc. 28 at 72). But a "lineup is not unduly suggestive merely because the defendant's photograph can be distinguished from the others." *United States v. Smith*, 148 F. App'x 867, 874 (11th Cir. 2005) (holding that "lineup was not unduly suggestive" where defendant "wore a blue T-shirt—in contrast to four of the other six people photographed—and the robber was alleged to have worn a blue T-shirt"). Davis offers no basis to conclude that the photopacks were unduly suggestive simply because he and another person were the only ones wearing gray shirts. *See Meeks v. Moore*, 216 F.3d 951, 968 (11th Cir. 2000) ("The source of this 'devastating[] suggestive[ness]' is that

[defendant] was the only person in the line-up wearing both a yellow shirt and yellow pants, and having no shoes. We fail to see how this is suggestive at all, and are completely at a loss to understand how it could be 'devastatingly suggestive.'").

Additionally, Davis points out that the other persons in the photopacks were 17 to 19 years old, while he was 29 years old. (Doc. 28 at 72; Doc. 23-9 at 2710). But the trial court reviewed the photopacks and stated that "they all look[ed] about the same age group, and I would have guessed mid 20s."[6] (Doc. 23-4 at 899). The trial court also noted that all six had "short hair" and "skin tones that [were] fairly similar." (*Id.*) Davis offers no basis to question these assertions. Thus, the age difference did not render the photopacks unduly suggestive. *See United States v. Collins*, 559 F.2d 561, 563 (9th Cir. 1977) (photopack not unduly suggestive where "[n]o significant difference in age [was] discernible in the photographs"). Lastly, Davis points out that the officer who conducted the photographic lineup "was an active investigator who knew Davis was a suspect and knew which picture was his." (Doc. 28 at 72). But "other than alleging the *potential* for an officer who knows which photograph contains the suspect to provide non-verbal cues," Davis has "presented no evidence of specific gestures or signals that the officer gave that influenced the identification[s]." *United States v. Smith*, 148 F. App'x 867, 874 (11th Cir. 2005); *see also United States v. Williams*, 688 F. App'x 895, 897 (11th Cir. 2017) (photographic lineup not unduly suggestive where, among other things, "[n]othing evidence[d] that the officers

---

[6] Similarly, Ortiz testified that "all" of the people in the photopack "look[ed] like they're between 25 and 30." (Doc. 23-4 at 847).

made suggestive comments to [the witness] indicating which photograph he should select or otherwise pressured [him] to make an identification").

In short, a reasonable jurist could conclude that the photopacks were not unduly suggestive. Therefore, Davis is not entitled to relief on this claim.[7]

### E. Ground Four, Sub-Claim A—Failure to Move to Suppress Based on Chain-of-Custody Issue

According to Davis, trial counsel should have moved to suppress Greisman's identification based on a "break" in the photopack's "chain of custody." (Doc. 1 at 53). In 2010, over two years after the identification, "it was determined that [the officer who conducted the photographic lineup] had not placed the photopack in evidence storage per standard procedure." *Davis*, 383 So. 3d at 739. After an "extensive search," the officer "found the photopack in a storage shed at her home where she had kept her own working files with copies of case documents." *Id.* The "photopack was admitted at trial, and both Greisman and [the officer] testified at trial as to its authenticity." *Id.* Davis argues that counsel provided ineffective assistance by failing to "move to suppress based on the chain-of-custody violation." (Doc. 28 at 75).

The Florida Supreme Court rejected Davis's ineffective-assistance claim. It held that "[c]ounsel was not deficient for failing to file a motion to suppress based on a chain of custody argument, and even if counsel had done so, Davis was not entitled to relief." *Davis*, 383 So. 3d at 738. The court explained that, under Florida law, "to suppress the photopack based on a faulty chain of custody, Davis would have been required to establish probable

[7] Even if this claim were subject to *de novo* review, it would fail for the reasons explained above.

tampering." *Id.* at 739 (citing *Peek v. State*, 395 So. 2d 492, 495 (Fla. 1980)). It rejected as "speculative" Davis's "claims of tampering" and adopted the postconviction court's reasoning on this score:

> Clearly, [the officer] did not follow the proper procedure by failing to enter the photo pack securely in evidence immediately after [] Greisman made the identification. However, [] Davis has offered only speculation that the location of the photo pack prior to being placed into evidence resulted in tampering. Such bare allegations are insufficient to render the evidence inadmissible. *See Terry v. State*, 668 So. 2d 954, n.4 (Fla. 1996); *Bush v. State*, 543 So. 2d 283, 284 (Fla. 2d DCA 1989). Instead, the testimony from [the officer] and [] Greisman reflect[s] that no tampering occurred during the time the photo pack was in [the officer's] shed.

*Id.* Thus, the Florida Supreme Court held that the postconviction court "did not err in summarily denying Davis's claim that counsel was ineffective for failing to file a motion to suppress to challenge the chain of custody of the photopack." *Id.*

The rejection of this claim was reasonable. "[A]lthough the issue of ineffective assistance . . . is one of constitutional dimension," a federal court "must defer to the state's construction of its own law when the validity of the [ineffective-assistance] claim . . . turns on state law." *Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1295 (11th Cir. 2017). Such deference is required here. The Florida Supreme Court held that, as a matter of Florida law, the motion to suppress would have failed because Davis did not establish "probable tampering" with the photopack. *Davis*, 383 So. 3d at 739. Thus, the Florida Supreme Court "already has told us how the issues would have been resolved under Florida state law had [counsel] done what [Davis] argues [they] should have done." *Herring v. Sec'y. Dep't of Corr.*, 397 F.3d 1338, 1354-55 (11th Cir. 2005). That determination is binding on federal habeas review. *See Calhoun v. Warden, Baldwin State Prison*, 92 F.4th 1338, 1352 (11th

Cir. 2024) (federal court owes "unconditional deference to a state high court's decision of a state-law issue in a federal habeas case"); *Spears v. Sec'y, Dep't of Corr.*, No. 8:20-cv-3011-KKM-AEP, 2023 WL 8436316, at *8 (M.D. Fla. Dec. 5, 2023) ("This Court must defer to the state court's determination that a motion to suppress evidence of the firearm based on a chain of custody argument would have been unsuccessful.").

Because the Florida Supreme Court "authoritatively decided as a matter of [Florida] law" that the chain-of-custody argument lacked merit, the remainder of the analysis is straightforward. *Calhoun*, 92 F.4th at 1351. "[I]t is axiomatic that the failure to raise nonmeritorious issues does not constitute ineffective assistance." *Bolender v. Singletary*, 16 F.3d 1547, 1573 (11th Cir. 1994). Thus, the Florida Supreme Court reasonably concluded that counsel did not render ineffective assistance by failing to argue that the chain-of-custody issue required suppression.[8]

### F. Ground Four, Sub-Claim B—Failure to "Aggressively Litigate" Motion to Suppress Based on "Stale" Search Warrant

Davis argues that trial counsel provided ineffective assistance by failing to "aggressively litigate a motion to suppress evidence based on a stale search warrant." (Doc. 28 at 129). One day after the incident at Headley Insurance, law enforcement obtained and executed a search warrant for Davis's wife's Nissan Altima, the car he drove to the robbery.

---

[8] Deference aside, Davis fails to point to "sufficient evidence to establish a probability of tampering, which would support exclusion of the evidence." *Overton v. State*, 976 So. 2d 536, 552 (Fla. 2007). Both Greisman and the officer who conducted the photographic lineup testified that the photopack was authentic. *Davis*, 383 So. 3d at 739. And nothing in the record suggests that the photopack was altered while it was stored in the shed. As the Florida Supreme Court explained, the officer clearly did not follow proper procedure for storing evidence, but "[a] mere break in the chain of custody is not in and of itself a basis for exclusion of physical evidence." *State v. Jones*, 30 So. 3d 619, 622 (Fla. 2d DCA 2010).

*Davis*, 383 So. 3d at 739. Several pieces of evidence were recovered from the car, "including driver and rear passenger floormats that tested positive for the presence of gasoline." *Id.* Although the search warrant was executed in December 2007, a complete copy of the warrant was not returned to the issuing judge until September 2008. (Doc. 32-3 at 818).

Davis moved to suppress the evidence recovered from the car, arguing (among other things) that the search warrant was "defective" because it was not returned to the judge within ten days of issuance, as required by Fla. Stat. § 933.05(2). (Doc. 23-4 at 979-80). At the hearing on the motion (Doc. 23-4 at 992), the trial court cited *State v. Featherstone*, a Florida appellate decision holding that § 933.05 "does not make void warrants which have been executed, by the subsequent failure of the officer to make return thereon." 246 So. 2d 597, 599 (Fla. 3d DCA 1971). *Featherstone* explained that "[w]hile it is the duty of the officer serving the search warrant to make due return when the same is served, nevertheless, the failure to do this will not have a retroactive effect to render void a search that was valid at the time it was made." 246 So. 2d at 599. Suppression might be appropriate, however, "if it appears that a failure by the officer to observe the statute and make due return results in any prejudice to the defendant." *Id.*

Citing *Featherstone*, the trial court stated that it could not "think of any prejudice [Davis] ha[d] by delaying the return" of the warrant. (Doc. 23-4 at 992). It invited defense counsel to "articulate some type of prejudice," and counsel responded, "If I could, I would." (*Id.* at 995). The court then held that "without [Davis] being able to demonstrate some degree of prejudice," the late return did not render the warrant void. (*Id.* at 996-97).

Davis contends that counsel provided ineffective assistance because, "rather than zealously advocate for his client regarding the prejudice from the late return, [he] acquiesced to the trial court that the motion to suppress was not supported by case law." (Doc. 28 at 82-83). The Florida Supreme Court disagreed, finding that Davis failed to "show[] that counsel's performance was deficient." *Davis*, 383 So. 3d at 740. As the court explained, Davis could not prevail on his ineffective-assistance claim unless he "prove[d] that his [underlying] Fourth Amendment claim [was] meritorious." *Id.* (internal quotation marks omitted). The court held that Davis "failed to establish a meritorious Fourth Amendment claim." *Id.* It explained that, as counsel "conceded" at the pretrial hearing, "the law was not favorable to the defense's position with respect to the delayed return of the warrant, given that the warrant itself was timely executed." *Id.* (citing *Featherstone*, 246 So. 2d at 599).

The court then considered whether Davis suffered prejudice from the failure to obtain suppression of the evidence. It noted that, "even if a motion to suppress would have been granted, [Davis] must show that there is a reasonable probability the result of the proceeding would have been different if not for counsel's error." *Id.* (internal quotation marks omitted). The court found that Davis could not satisfy this standard. *Id.* According to the court, "even if the evidence obtained from the Altima had been suppressed, that evidence was only a part of that linking Davis to the Headley crimes." *Id.* The court summarized the other evidence as follows:

> Multiple individuals testified that they heard Bustamante's dying declaration identifying Davis as the perpetrator. Gunshot victim Greisman identified Davis as the person who shot him. Eyewitness Ortiz also identified Davis as

> the person who shot Greisman, and he testified that he recognized Davis from a former worksite.
>
> Davis also made incriminating statements to family members and a family friend. He also made several incriminating purchases, notably a firearm that had rifling characteristics consistent with the projectiles obtained at the Headley crime scene and from Bustamante's hand. The day of the incident, he purchased a lighter, as well as a cooler that he was seen putting a gun into after he shot Greisman. A gasoline can was found at Headley, and the gasoline can normally kept at Davis's home was missing when the home was searched. Additionally, Davis made an account deposit at his bank shortly after the robbery at Headley, and his account previously had a very low balance.

*Id.* Based on the substantial independent evidence of Davis's guilt, the court found no reasonable probability that "the outcome of his trial would have been different" had the vehicle evidence been excluded. *Id.*

The Florida Supreme Court reasonably rejected Davis's ineffective-assistance claim. To prevail on this claim, Davis needed to show "(1) that counsel's representation fell below an objective standard of reasonableness, (2) that the Fourth Amendment claim is meritorious, and (3) that there is a reasonable probability that the verdict would have been different absent the excludable evidence." *Zakrzewski v. McDonough*, 455 F.3d 1254, 1260 (11th Cir. 2006).

As the Florida Supreme Court correctly explained, Davis "failed to establish a meritorious Fourth Amendment claim." *Davis*, 383 So. 3d at 740. Davis does not dispute that there was probable cause to search the Nissan Altima, nor does he allege that any irregularities occurred *before* law enforcement obtained the search warrant. Thus, at the time of the search, Davis's "rights under the Fourth Amendment were not being infringed." *United States v. Hall*, 505 F.2d 961, 963 (3d Cir. 1974). "The irregularity occurred only

after a valid search and seizure," and "such irregularity is not constitutionally significant under the Fourth Amendment." *Id.* (holding that Fourth Amendment did not require suppression based on "government agent's failure to promptly make a search warrant return" in violation of Federal Rule of Criminal Procedure 41). Regardless, Davis fails to show that the late return of the search warrant "result[ed] in any prejudice to" him. *Featherstone*, 246 So. 2d at 599. For example, he does not contend that the delay prevented him from analyzing the seized evidence or challenging its admissibility. Indeed, the search warrant was returned to the issuing judge in September 2008, and Davis's first trial did not occur until October 2010. (Doc. 32-3 at 818; Doc. 32-5 at 377).

Furthermore, a fairminded jurist could agree that there is no "reasonable probability that the verdict would have been different absent the [allegedly] excludable evidence." *Zakrzewski*, 455 F.3d at 1260. Even setting aside the items recovered from the Nissan Altima, the prosecution presented "substantial evidence" of Davis's guilt. *Fugate v. Head*, 261 F.3d 1206, 1224 (11th Cir. 2001); *see also McCoy v. Newsome*, 953 F.2d 1252, 1262 (11th Cir. 1992) ("[T]he other substantial evidence of [petitioner's] guilt negates any possibility of prejudice resulting from his attorney's [alleged deficiencies]."). The Florida Supreme Court accurately recounted the overwhelming evidence against Davis. *Davis*, 383 So. 3d at 740. Given the strength of the prosecution's case, a fairminded jurist could agree with the Florida Supreme Court's finding of no prejudice. *See Bates v. Sec'y, Fla. Dep't of Corr.*, 768 F.3d 1278, 1300 n.9 (11th Cir. 2014) ("The overwhelming evidence of [petitioner's] guilt . . . makes it obvious that [he] cannot show *Strickland* prejudice.").

### G. Ground Four, Sub-Claim C—Failure to Present Evidence of Lost Dashcam Footage

Davis contends that trial counsel "should have confronted the State's law enforcement witnesses with the evidence that there was missing dashcam footage from the crime scene." (Doc. 28 at 84-85). After the incident at Headley Insurance, "Lake Wales Police Sergeant Griffin Crosby filed a supplemental report indicating that he retrieved dashboard camera footage from the police car of another officer who reported to the Headley scene." *Davis*, 383 So. 3d at 741. The supplemental report explained:

> On 12/27/2007, I recovered the video hard drive from Officer Hampton's in-car video system. I then transferred the video images to the Digital Eyewitness Media Manager (DEMM). The server is secured with limited access. I then transferred the video images from the DEMM, to a Digital Video Disc (DVD). The disc was turned over to the Property/Evidence Custodian. At this time, I have no further information regarding this case.

*Id.* Defense counsel did not obtain the footage. *Id.* During a June 2010 deposition, however, Sergeant Crosby described the footage as follows:

> [Officer Hampton's in-car video] just shows him pulling into the west side of the Headley parking lot. It shows the vehicle—I mean the building burning, and then you can see him run across the front of the screen. That's really about all it shows. And then, of course, you can see the firefighters and other personnel running around.

*Id.*

Davis contends that counsel should have obtained the video and used it to "contest the eyewitness testimony of Headley witnesses at trial," including Lt. Elrod's testimony about Bustamante's dying declaration. (Doc. 28 at 87). Even if the video were unavailable, counsel allegedly could have "used its disappearance as grounds for cross-examination of

several witnesses by showing that law enforcement failed to preserve critical evidence."[9] (*Id.*)

The Florida Supreme Court held that the postconviction court "did not err in summarily denying Davis's speculative claim." *Davis*, 383 So. 3d at 741. This ruling was reasonable. As the Florida Supreme court explained, "[c]ounsel deposed Sergeant Crosby and inquired about the DVD footage during the deposition." *Id.* Sergeant Crosby "described the limited nature of the footage and provided no reasonable basis for concluding that the footage contained or would have produced evidence helpful to the defense." *Id.* As the court correctly noted, this testimony "undermined Davis's conclusory allegation that the footage would have refuted the substantial evidence of his identity as the perpetrator." *Id.* Indeed, "multiple eyewitnesses identified Davis, two of whom selected his photograph from photopacks shortly after the crimes." *Id.* In short, nothing in the record suggests that the missing footage would have aided the defense, nor is there any reasonable probability that the verdict would have been different had the jury learned that the (apparently inconsequential) footage went missing. Davis's arguments to the contrary are speculative and cannot support relief under *Strickland*.[10] *See Johnson v. Alabama*, 256 F.3d

[9] During the state postconviction proceedings, Davis unsuccessfully attempted to obtain the video footage. (Doc. 1 at 60).

[10] Davis contends that this claim is subject to *de novo* review because the Florida Supreme Court "did not conduct an independent merits assessment of the claim under *Strickland*." (Doc. 28 at 86). But the court did address the merits of the claim. As explained above, it held that Davis's assertion of ineffective assistance failed because the evidence refuted his conclusory allegation that the footage would have aided the defense. *Davis*, 383 So. 3d at 741. That is an adjudication on the merits. *See Maddox v. Tucker*, No. 11-14180-CIV, 2012 WL 13176114, at *8 (S.D. Fla. Feb. 14, 2012) ("Speculative and conclusory claims are inadequate as a matter of law to raise a claim of ineffective assistance of counsel that merits relief."), *adopted by* 2012 WL 13176115 (S.D. Fla. Apr. 24, 2012). Regardless, for the reasons stated above, Davis's claim fails even under *de novo* review.

1156, 1187 (11th Cir. 2001) (noting that "speculation that the missing [evidence] would have been helpful" is "insufficient to carry the burden of a habeas corpus petitioner"); *Aldrich v. Wainwright,* 777 F.2d 630, 636 (11th Cir. 1985) ("Speculation is insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation.").

**H. Ground Five—Failure to Conduct Case-Specific Voir Dire**

Davis argues that trial counsel rendered ineffective assistance by failing "to engage in case-specific voir dire designed to discover jurors [who] could not be fair and impartial to Davis in the guilt phase or consider his mitigation during the penalty phase." (Doc. 1 at 61). According to Davis, counsel "eschewed the highly technical guidance offered by the American Bar Association regarding the selection of capital juries (ABA Guidelines)." (*Id.*)

During the postconviction evidentiary hearing, Davis focused on five questions that counsel allegedly should have posed to prospective jurors. *Davis*, 383 So. 3d at 737. The first question was: "Based on the pictures of the deceased you were shown earlier—if we were to reach the penalty phase, could you entertain the possibility [that] the time Ms. Bustamante and Ms. Luciano spent in pain was relatively short?"[11] *Id.* Counsel explained that he did not ask this question because it would have required him to "get[] into the facts of the case much more extensively" than is appropriate during jury selection. (Doc. 32-5 at 419). Counsel also said that during the penalty phase, he addressed "at every point [he]

[11] As discussed below, during jury selection, "one photograph of each deceased victim was shown to the jury." *Davis*, 383 So. 3d at 735.

could" "the length that the[] [victims] would have been in pain versus being desensitized, nerve endings being destroyed, medication, being put into [a] coma." (*Id.*) The goal at the penalty phase was to "minimiz[e] as much as we could the amount of pain they were in." (*Id.*)

Second, counsel was asked why he failed to pose the following question: "Does the death of an unborn fetus/child affect your ability to be fair and impartial[?]" *Davis*, 383 So. 3d at 737. Counsel responded that the question was unnecessary because the trial court already "explained . . . to the jurors" that this case involved the death of a child. (Doc. 32-5 at 421-22). Specifically, the trial court "indicate[d] . . . to the jury[] that there was a child that was born cesarean and the child died, [and] you're going to see photographs of the child." (*Id.* at 421). Counsel "liked" the court's announcement because he believed that "jurors listen to the judges better than they do the attorneys." (*Id.*)

Third, counsel was asked about the following proposed question: "Given the injuries you observed in the photos shown to you earlier in jury selection is there any set of mitigating circumstances you could ever hear that would outweigh what you observed in those photographs?" *Davis*, 383 So. 3d at 737. Counsel explained that the question was unnecessary because "the reason for showing them the photographs was to see if they could be fair and impartial despite having seen those photographs." (Doc. 32-5 at 422). Specifically, if the jurors "say they can be fair and impartial after being shown these photographs, then mitigation isn't required to get them to outweigh it, they've already said they can be fair and impartial and would not allow the emotional aspects of the photos to influence their verdict." (*Id.*) Counsel also believed that discussion of "specific mitigating

circumstances" would require delving into the "facts of the case," and he worried that he would be "shut down on that." (*Id.* at 423).

Fourth, Davis asked counsel about his failure to pose the following questions: "It has been put forth that the photos, and thus this case, is the worst any of the court personnel have seen—do you understand you have to completely put that out of your mind in deciding these cases? Are you in fact able to put those comments out of your mind?" *Davis*, 383 So. 3d at 738. Counsel responded that "the comment about it being the worst photos" had been made "in the context of individual voir dire of one of the jurors." (Doc. 32-5 at 423). Because the remark "occurred just in front of one juror," counsel saw no need to "ask that of all the other jurors." (*Id.*)

Lastly, counsel was asked whether he would have posed this question: "If you were to find [] Davis guilty of First Degree Murder and that the basic facts outlined by the judge earlier were the result of [] Davis's actions—could you begin the sentencing phase presuming [] Davis was entitled to a life sentence?" *Davis*, 383 So. 3d at 738. Counsel responded that he "would never frame a question like that. I'm not even going to ask them to hypothetically consider [] Davis being guilty." (Doc. 32-5 at 424). According to counsel, he is not "one of those attorneys who in [the] penalty phase when my client's maintained his innocence gets up there and does the tap dance of, well, you found him guilty and I respect that." (*Id.*) Instead, counsel "stand[s] up there and . . . maintain[s] my client's innocence and I say you guys felt otherwise but I'm behind my client in terms of their claim of innocence." (*Id.*) Counsel further explained that, for "tactical and strategic reasons," he did not spend much time on the "death penalty" during voir dire. (*Id.* at 425). In counsel's

view, "[i]n a case where you're maintaining your client's innocence, if you spend a ton of time on the death penalty . . . , I don't care how you preface it, the jurors are thinking, okay, he thinks we're gonna get there." (*Id.*) Counsel thus emphasized the "guilt phase" during voir dire, though he "covered the penalty phase to the extent that [he] felt necessary to feel comfortable moving forward with the particular jurors." (*Id.*)

After reviewing each proposed question and counsel's response, the Florida Supreme Court concluded that Davis had failed to "establish[] that counsel's performance was deficient." *Davis*, 383 So. 3d at 738. The court explained that counsel "provided specific, strategic reasons why he did not ask the questions that Davis identified." *Id.* Moreover, Davis had not shown "that counsel's strategy was unreasonable." *Id.* The court also held that "Davis's reliance on the ABA's jury selection guidelines [did] not further his claim that counsel was ineffective." *Id.* The court reasoned that "[t]he ABA Guidelines are not a set of rules constitutionally mandated under the Sixth Amendment and that govern the . . . *Strickland* analysis. . . . To hold otherwise would effectively revoke the presumption that trial counsel's actions, based upon strategic decisions, are reasonable." *Id.* (citing *Mendoza v. State*, 87 So. 3d 644, 653 (Fla. 2011)).

A fairminded jurist could agree that counsel was not deficient for failing to engage in the proposed "case-specific voir dire." (Doc. 1 at 67). "To give trial counsel proper deference," courts "presume[] that trial counsel provided effective assistance" during voir dire. *Harvey v. Warden, Union Corr. Inst.*, 629 F.3d 1228, 1245 (11th Cir. 2011); *see also Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001) ("Counsel is also accorded particular deference when conducting voir dire. An attorney's actions during voir dire are

considered to be matters of trial strategy."). To overcome the presumption of effective assistance, "a petitioner must establish that no competent counsel would have taken the action that his counsel did take." *Chandler*, 218 F.3d at 1315. Moreover, because AEDPA applies to his ineffective-assistance claim, Davis needs to "show that no reasonable jurist could find that his counsel's performance fell within the wide range of reasonable professional conduct." *Franks*, 975 F.3d at 1176. Thus, "if some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied." *Hill v. Humphrey*, 662 F.3d 1335, 1346 (11th Cir. 2011). "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102.

Davis cannot meet his burden. The Florida Supreme Court correctly explained that counsel "provided specific, strategic reasons why he did not ask the questions that Davis identified." *Davis*, 383 So. 3d at 738. Davis disagrees with those reasons, but a fairminded jurist could conclude that "some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted [during voir dire]." *Waters*, 46 F.3d at 1512. Likewise, counsel's overall approach to voir dire reflected a reasoned strategic judgment. As the Florida Supreme Court put it, "counsel . . . focused on the guilt phase during jury selection, and he did not want to spend too much time discussing the death penalty because he did not want to send a message to prospective jurors that he expected the trial to get to the penalty phase." *Davis*, 383 So. 3d at 738. An attorney may make "a reasonable tactical decision" to "focus the jury on the idea of the death penalty as little as possible." *Brown v. Jones*, 255 F.3d 1273, 1279 (11th Cir. 2001). Moreover, as explained above, Davis was represented by a highly experienced criminal defense lawyer who had practiced in Polk

County since 1985 and handled multiple death penalty cases. (Doc. 32-5 at 335, 369). Where, as here, a court "examin[es] the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger." *Chandler*, 218 F.3d at 1316; *see also Provenzano*, 148 F.3d at 1332 ("Our strong reluctance to second guess strategic decisions is even greater where those decisions were made by experienced criminal defense counsel.").

Additionally, the Florida Supreme Court did not err in holding that "Davis's reliance on the ABA's jury selection guidelines [did] not further his claim that counsel was ineffective."[12] *Davis*, 383 So. 3d at 738. "The ABA Guidelines do not establish independent standards for counsel; rather, they are merely guides to be considered in determining whether an attorney's conduct was reasonable." *Anderson v. Sec'y, Fla. Dep't of Corr.*, 752 F.3d 881, 904 (11th Cir. 2014). As *Strickland* itself recognized, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." 466 U.S. at 688-89. For the reasons explained above, a fairminded jurist could conclude that Davis failed to overcome the "strong presumption of competent assistance" during voir dire.[13] *Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1209 (11th Cir. 2007).

---

[12] The relevant portion of the ABA Guidelines instructs capital defense counsel to "devote substantial time to . . . preparing a case-specific set of voir dire questions, planning a strategy for voir dire, and choosing a jury most favorable to the theories of mitigation that will be presented." (Doc. 28 at 94).

[13] Davis argues that the Florida Supreme Court's decision contravened *Morgan v. Illinois*, 504 U.S. 719 (1992). (Doc. 28 at 99). *Morgan* held that "on voir dire the court must, on defendant's request, inquire into the prospective jurors' views on capital punishment" because a prospective juror who would always impose

### I. Ground Six—Failure to Adequately Investigate and Present Mitigation

Davis faults trial counsel for failing to "adequately investigate and present readily available mitigating evidence during [the] penalty phase." (Doc. 1 at 67). According to Davis, counsel "failed to seek out readily available records concerning Davis and his family; failed to interview family members and others with relevant information; and failed to seek the assistance of mental health experts to assist in the investigation and presentation of mitigating evidence and the evaluation of Davis's mental state at the time of the crime and the trial." (*Id.* at 67-68). Davis argues that "[a] more fulsome investigation would have quickly produced far more accurate and compelling mitigation than was presented, and there is a reasonable probability that Davis would not have been sentenced to death." (*Id.* at 68).

Respondents contend that this claim is unexhausted and procedurally defaulted. (Doc. 22 at 87). The Court need not reach that issue because, even under *de novo* review, the claim fails on the merits. *See Dallas v. Warden*, 964 F.3d 1285, 1307 (11th Cir. 2020) ("As we have said many times and as the Supreme Court has held, a federal court may skip over the procedural default analysis if a claim would fail on the merits in any event." (collecting cases)). As explained below, Davis fails to establish "a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of

the death penalty must not be empaneled. 504 U.S. at 726. But "*Morgan* does not mandate that life-qualifying questions be asked of potential jurors in every case. Instead, *Morgan* holds that a defendant has the right to life-qualify his jury upon request." *Stojetz v. Ishee*, 892 F.3d 175, 195 (6th Cir. 2018). As explained above, the Florida Supreme Court reasonably concluded that counsel had sound, strategic reasons to refrain from asking the questions proposed by Davis. This ruling did not violate *Morgan*. *See Stanford v. Parker*, 266 F.3d 442, 454 (6th Cir. 2001) ("*Morgan* suggests that there are instances where defense counsel might choose not to ask life-qualifying questions as a matter of strategy.").

aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.

As the Florida Supreme Court recounted, Davis presented the following evidence in mitigation at the penalty phase:

> Multiple witnesses testified that Davis's childhood was marked by abuse. When Davis was eight years old, he was sexually assaulted by another child. The following year, a woman named Ms. Clark moved into the family home as a roommate. Sometime later, Davis and his brother Garrion moved out of the family home and began staying with Clark, who was an alcoholic and was physically and verbally abusive. Clark routinely beat Davis, and on one occasion, she caused severe injuries to the back of his body by beating him with an extension cord. Clark taunted Davis with physical and verbal abuse because he was bullied by other children, and she also hit him with water hoses and punched him in the chest. Family members observed physical injuries such as welts, bleeding, and open scabs and sores on Davis's body.
>
> Additionally, Davis suffered from ongoing depressive and mood episodes, in part due to the bullying he suffered from elementary school through high school. In middle school, Davis began talking about suicide, and his mother encouraged him not to take his life. Davis received mental health counseling for two to three months, but his problems continued. After graduating from high school, Davis joined the United States Marine Corps. However, the following year, Davis was involved in a vehicle accident and he revealed that he intentionally crashed the vehicle that he was driving. Pursuant to a recommendation for an administrative separation, Davis was discharged from military service.
>
> Although Davis was only about one year old when his father moved out of the family home, his father remained a part of Davis's life. While growing up, Davis and his siblings were separated and placed in foster care, but Davis remained close with his mother and siblings. Davis's sister, India Owens, described him as compassionate, loving, and selfless. After Davis's discharge from the military, he met a woman named Dawn Henry, with whom he had a son. The child was born with Down Syndrome. Henry testified that while she had trouble adjusting to being a mother of a child with special needs, Davis immediately accepted their son and was consistently present in his life.

> Around the time of the robbery, Davis was depressed and upset that he could not afford to do anything for his son's birthday. Davis's mother testified that when Davis purchased the revolver shortly before the robbery, she was concerned that Davis might use it to commit suicide.

*Davis*, 207 So. 3d at 156. Although not mentioned in this summary, Davis's military records indicated that after he attempted to commit suicide by crashing his vehicle, he was diagnosed with a "personality disorder." (Doc. 23-10 at 185).

The jury unanimously recommended that Davis be sentenced to death for murdering Bustamante and Luciano. *Davis*, 207 So. 3d at 157. The trial court ultimately imposed death sentences for both murders, concluding that the "aggravating circumstances far outweigh[ed] the mitigating circumstances." (Doc. 23-6 at 1633). The court found six aggravating circumstances as to both murders, but it gave "especially great weight" to three: (1) "the capital felony was committed in a cold, calculated, and premeditated manner without any prete[nse] of moral or legal justification"; (2) "the capital felony was especially heinous, atrocious[, or] cruel"; and (3) Davis "was contemporaneously convicted of another capital felony," specifically first-degree murder, attempted first-degree murder, and armed robbery. (*Id.* at 1632-33). The court found one statutory mitigating circumstance—"the crime was committed while Davis was under the influence of extreme mental or emotional disturbance"—and fifteen nonstatutory mitigating circumstances, including that (1) Davis was bullied and sexually assaulted as a child; (2) he "was the victim of both physical and emotional child abuse by a caretaker"; (3) he "had a history of being suicidal, both as a child and as an adult"; (4) he "was diagnosed with a personality

disorder"; and (5) he was "dealing with" "stress" during the incident. *Davis*, 207 So. 3d at 157.

Davis now contends that, had counsel conducted an "adequate investigation," an "abundance" of additional mitigating evidence would have emerged. (Doc. 28 at 122). Specifically, the jury and the trial court would have learned that (1) Davis's mother "severely beat" him and his siblings, "subject[ing] [him] to waterboarding in the kitchen sink"; (2) Davis's mother suffered from bipolar disorder and schizophrenia, she tried to kill herself during Davis's childhood, and she "sold cocaine out of the house"; (3) Davis's sister suffered from bipolar disorder; (4) Davis "long exhibited behaviors" consistent with bipolar disorder, including mood swings and "extreme" obsessive-compulsive behavior; (5) Davis's "self-confidence, self-efficacy, and decision-making skills were irreparably ruined by the parental abandonment he experienced and overall lack of positive role models"; (6) Davis's "Adverse Childhood Experience Questionnaire" score was eight, a figure reached by less than "2.25% of a sample of high-risk youth in the Florida Department of Juvenile Justice database"; and (7) Davis may have "suffered a traumatic brain injury during the car crash/suicide attempt." (*Id.* at 122-27).

Davis has not met his burden of establishing that he was prejudiced by counsel's failure to present additional mitigating evidence. "When an ineffective-assistance-of-counsel claim is based on counsel's performance at the sentencing phase of a capital case, a defendant is prejudiced only if there is a reasonable probability that, absent [counsel's] errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Thornell v. Jones*, 602 U.S. 154, 163

(2024) (internal quotation marks omitted). "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112. "In determining whether there is a reasonable probability of a different result, a court must consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweig[h] it against the evidence in aggravation." *Gavin v. Comm'r, Alabama Dep't of Corr.*, 40 F.4th 1247, 1263 (11th Cir. 2022) (internal quotation marks omitted).

As an initial matter, much of the additional mitigation is cumulative of the evidence presented at the penalty phase. As the Florida Supreme Court explained, the jury and the trial court heard that "Davis's childhood was marked by abuse." *Davis*, 207 So. 3d at 156. They learned that Davis moved out of the family home and stayed with Ms. Clark, an "alcoholic" who "routinely beat Davis, and on one occasion, . . . caused severe injuries to the back of his body by beating him with an extension cord." *Id.* The penalty phase included evidence that family members saw "physical injuries such as welts, bleeding, and open scabs and sores on Davis's body," and that Davis "was sexually assaulted by another child" when he was eight years old. *Id.* Davis faults counsel for failing to present additional evidence about his mother: that she also subjected him to physical abuse, suffered from bipolar disorder, attempted to kill herself, and dealt drugs out of the family home. (Doc. 28 at 122-23). He also notes that, according to the Adverse Childhood Experience Questionnaire, he experienced a level of childhood adversity suffered by a small percentage of the population. (*Id.* at 126). Finally, he claims that a "mental health expert" could have explained that his emotional development was "ruined by the parental abandonment he

experienced and overall lack of positive role models." (*Id.*) This new evidence of "childhood trauma" would have provided little benefit to Davis because it was "substantially similar to the evidence [he] presented at the" penalty phase. *Sochor v. Sec'y Dep't of Corr.*, 685 F.3d 1016, 1032 (11th Cir. 2012). As the summary above makes clear, the jury and the trial court were well aware that Davis endured a severely abusive childhood that detrimentally affected his mental health. "Obviously, a petitioner cannot satisfy the prejudice prong of the *Strickland* test with evidence that is merely cumulative of evidence already presented at trial." *Rose v. McNeil*, 634 F.3d 1224, 1243 (11th Cir. 2011).

Davis also fails to show that he was prejudiced by the omission of additional mental-health evidence. According to Davis, he "long exhibited behaviors and symptoms of" bipolar disorder, including mood swings, "'loops' with his behavior," "extreme" obsessive-compulsive behaviors, a "short temper," and "anxiety." (Doc. 28 at 125). But Davis presents no evidence that he has ever formally been diagnosed with bipolar disorder. Instead, he says that counsel should have sought a "mental health evaluation from an appropriate mental health professional to assess whether . . . [he] suffered from this illness." (*Id.*) This Court cannot "simply assume that if [Davis] had undergone further examination," a diagnosis of bipolar disorder "would have, in fact, been made." *Hall v. Head*, 310 F.3d 683, 704 (11th Cir. 2002). "Speculation is insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation."[14]

[14] Equally speculative is Davis's assertion that he might have "suffered a traumatic brain injury during the car crash/suicide attempt." (Doc. 28 at 127). Davis presents no new evidence to support the existence of such an injury.

*Aldrich,* 777 F.2d at 636. Regardless, the jury and the trial court learned that Davis "suffered from ongoing depressive and mood episodes," that he talked about killing himself, that he once attempted to commit suicide by crashing a vehicle he was driving, and that he engaged in behavior that "we would consider . . . obsessive compulsive disorder." *Davis*, 207 So. 3d at 156; Doc. 23-10 at 332. Additional mental-health evidence would have merely told "a more detailed version of the same story told at trial[,] provide[d] more or better examples[,] or amplifie[d] the themes presented to the jury." *Dallas*, 964 F.3d at 1308.

Davis's "failure to adduce significant new mitigating evidence stands in contrast to cases in which courts have concluded that petitioners met their burden under the prejudice prong." *Knight v. Fla. Dep't of Corr.*, 958 F.3d 1035, 1049 (11th Cir. 2020). For example, in *Porter v. McCollum*, "[t]he judge and jury at Porter's original sentencing heard almost nothing that would humanize Porter or allow them to accurately gauge his moral culpability." 558 U.S. 30, 41 (2009). Counsel was deficient for failing to present substantial mitigating evidence, including "(1) Porter's heroic military service in two of the most critical—and horrific—battles of the Korean War, (2) his struggles to regain normality upon his return from war, (3) his childhood history of physical abuse, and (4) his brain abnormality, difficulty reading and writing, and limited schooling." *Id.* Thus, *Porter* involved a "vast" "disparity between what was presented at trial and what was offered collaterally." *Dallas*, 964 F.3d at 1312. Here, by contrast, the new mitigating evidence "would barely have altered the sentencing profile presented" at Davis's trial. *Strickland*, 466 U.S. at 700.

Moreover, "the aggravating evidence presented against [Davis] was powerful." *Sealey v. Warden, Ga. Diagnostic Prison*, 954 F.3d 1338, 1357 (11th Cir. 2020). The murders of Bustamante and Luciano were extremely brutal. During the robbery, Davis "bound the women with duct tape, poured gasoline on them, and set them on fire." *Davis*, 207 So. 3d at 147. Davis then shot Bustamante "in her left hand" as she tried to escape, and he proceeded to shoot a Good Samaritan in the face. *Id.* at 147-48. Bustamante and Luciano suffered catastrophic burns that covered eighty to ninety percent of their bodies. *Id.* at 151. Both ultimately died of their injuries, as did Luciano's prematurely delivered child. *Id.* Davis arrived equipped for the crime, carrying "a loaded .357 magnum revolver[,] . . . duct tape, a cigarette lighter, gloves, a gasoline can that contained gasoline, and a lunch cooler to conceal the revolver." *Id.* at 147. Based on these and other facts, the trial court found that the murders were "especially heinous, atrocious, or cruel," and that Davis committed the murders "in a cold, calculated[,] and premeditated manner without any pretense of moral or legal justification." *Id.* at 157. In Florida, "the heinous, atrocious, or cruel [and] the cold, calculated, and premeditated aggravators . . . are two of the most serious aggravators set out in the statutory sentencing scheme." *Larkins v. State*, 739 So. 2d 90, 95 (Fla. 1999). "In the face of these facts and the extensive mitigating evidence offered by defense counsel at the penalty phase, adding all of this together, the good and the bad, there is no reasonable probability that the additional mitigating evidence would have changed the outcome." *Pittman v. Sec'y, Fla. Dep't of Corr.*, 871 F.3d 1231, 1254 (11th Cir. 2017).

### J. Ground Seven—Cumulative Error

Davis contends that "[c]umulative errors during both the guilt and penalty phases" violated his right to a fair trial. (Doc. 28 at 128-29). "Under the cumulative-error doctrine, a sufficient agglomeration of otherwise harmless or nonreversible errors can warrant reversal if their aggregate effect is to deprive the defendant of a fair trial." *Insignares v. Sec'y, Fla. Dep't of Corr.*, 755 F.3d 1273, 1284 (11th Cir. 2014). A cumulative-error claim "must fail," however, where none of the "individual claims of error" has "any merit." *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012). As explained above, Davis's assertions of trial-court error and trial-level ineffective assistance uniformly lack merit. Therefore, he cannot show cumulative prejudicial effect.

### K. Ground Eight—Ineffective Assistance of Appellate Counsel

Lastly, Davis contends that appellate counsel provided ineffective assistance by failing to raise "significant trial court errors committed during jury selection." (Doc. 1 at 77). Specifically, the trial court allegedly "made improper and prejudicial statements that, together, convinced the jury that the . . . judge believed . . . Davis's case was the worst of the worst." (Doc. 28 at 131). Davis concedes that trial counsel did not contemporaneously object to any of the challenged remarks. (Doc. 1 at 77). Nevertheless, Davis argues that appellate counsel should have "raise[d] these claims as fundamental error on direct appeal." (*Id.* at 78).

The Florida Supreme Court rejected this claim, finding that it was both "procedurally barred" and "meritless."[15] *Davis*, 383 So. 3d at 742-43. The court acknowledged that, "while the failure to raise unpreserved claims on appeal is not normally a basis for ineffective assistance of appellate counsel, the failure to raise unpreserved claims of fundamental error may be." *Id.* at 742. The court found, however, that the challenged remarks were not objectionable. *Id.* at 735-37.

The first set of remarks concerned the photographs of the victims. *Davis*, 383 So. 3d at 735. During jury selection, "one photograph of each deceased victim was shown to the jury." *Id.* Before showing the photographs, the trial court offered the following explanation:

> This case is truly not for the faint of heart. The photographs alone in this case are graphic.
>
> For the last three and a half years, I have handled all of the first-degree murder cases in this circuit, and I have been doing this for 16 years, so I have seen a lot in my service on the bench. And I typically tell jurors that you are going to see photographs, because in every homicide case, the jury is shown photographs of the crime scene and they are typically shown photographs from an autopsy, where a medical examiner performs an autopsy on the victim, and I tell people typically that yes, you may see some blood and it is not something you particularly want to look at, but it is no worse than you probably see on television any more. As you will know, between movies and television, it's become so graphic that I don't see jurors shocked as maybe 10 or 15 years ago. These photographs are graphic.
>
> There are some people, and I don't fault you if you fall in this category, but there are some folks that may not be able to handle the emotional aspect of this case and the graphic nature of this case.

[15] The Florida Supreme Court's "alternative holding is an adjudication on the merits" subject to AEDPA deference even though it also rejected the claim on a procedural ground. *Raulerson v. Warden*, 928 F.3d 987, 1001 (11th Cir. 2019); *see also Riechmann v. Fla. Dep't of Corr.*, 940 F.3d 559, 580 (11th Cir. 2019) (AEDPA deference applied where Florida Supreme Court "invoked a procedural bar to reject" petitioner's claim but also "offered an alternative merits ruling").

> I don't normally give this kind of presentation for my other cases, we just simply tell folks there may be some semi-graphic photographs, if you have a weak stomach, let us know, we'll talk about it. But I don't do it quite like we're doing this.
>
> And the reason I'm doing this, I don't want to pick a jury, and you see how much time we're spending to get this done correctly, and then the first day that you are shown photographs, one of you absolutely can't take it and emotionally and I have lost a juror or two or three.

*Id.* at 735-36.

The Florida Supreme Court found that, contrary to Davis's assertion, these remarks "did not describe the photographs as 'the worst' relative to other cases." *Id.* at 736. "While the [trial] court did comment on the graphic nature of the photographs," the Florida Supreme Court ruled that "the full context demonstrate[d] that the court was stressing to the prospective jurors the importance of providing candid responses when they were individually shown photographs of the victims." *Id.*

The second set of remarks concerned the differences between a non-capital first-degree murder case and a capital case. *Id.* at 736-37. Specifically, the trial court told the prospective jurors that:

> We're going to talk to you about two issues in private. And that is whether you know anything about the case from having seen it in the media in whatever form. Or whether you know people involved and have heard about it and so on. The other thing we're going to talk about is your views on the death penalty. Without a doubt the most difficult issue we ask judges and jurors to decide is the issue of capital punishment. The State of Florida has a statutory procedure set up in dealing with this. And I read to you the bifurcated instruction, but it starts very simply, and that is the State must put someone on notice of seeking the death penalty. The death penalty is not appropriate in all First Degree Murder cases, and the State does not seek it in all First Degree Murder cases. Once that occurs, if the Defendant is found guilty of First Degree Murder, and First Degree Murder only, not some

> lesser. If the Defendant is found guilty of some lesser crime or found not guilty then your job is done. If and only if the Defendant is found guilty of First Degree Murder do you then start considering the issue of penalty.

*Id.* The trial court made similar remarks at other points during jury selection. For example, it stated that:

> The death penalty in Florida is not appropriate in all cases. In fact, the state attorney doesn't even file notice of seeking it in all First Degree Murder cases.
>
> A number of years ago, actually around 1976, somewhere in there, the state of Florida created a system of aggravating circumstances by statute to narrow down the number of cases in which the death penalty would be appropriate. And it is designed for the worst of the worst, if you will.
>
> The state must prove beyond a reasonable doubt at least one aggravating circumstance or the death penalty is not applicable. But if the state does prove one or more, then you must consider it, and you, individually, should assign it some weight or value. That's entirely up to you how you do it.

(Doc. 23-7 at 919-20).

The Florida Supreme Court held that these remarks were not improper. *Davis*, 383 So. 3d at 737. It found that "the trial court's comments did not suggest that Davis was more deserving of the death penalty than other capital defendants." *Id.* "To the contrary, the trial court emphasized the jury's role in determining whether Davis was guilty and explained that the jury would only reach deliberations on the death penalty if it first found Davis guilty of first-degree murder." *Id.*

The Florida Supreme Court reasonably concluded that Davis was "not entitled to habeas relief" on his ineffective-assistance claim. *Id.* at 743. As Davis concedes, trial counsel did not contemporaneously object to any of the challenged remarks. (Doc. 1 at 77). Thus, the claim for ineffective assistance of *appellate* counsel turns on whether the alleged

errors were "fundamental" under Florida law. If they were "not fundamental, then [Davis's] appellate counsel would have been procedurally barred from raising [them] on appeal, and so he could not have been ineffective for failing to raise [them]." *Scott v. Sec'y, Dep't of Corr.*, 857 F. App'x 548, 551 (11th Cir. 2021).

The Florida Supreme Court ruled that the challenged remarks were not erroneous, which necessarily means that they did not constitute fundamental error. *Davis*, 383 So. 3d at 736-37; *see also Corbitt v. State*, 220 So. 3d 446, 450 (Fla. 5th DCA 2016) ("[B]ecause there is no error, there is no fundamental error to analyze."). "[T]he fundamental error question is an issue of state law, and state law is what the state courts say it is." *Pinkney,* 876 F.3d at 1299. Therefore, this Court "must defer" to the Florida Supreme Court's "implicit[]" determination that the remarks did not rise to the level of fundamental error. *Id.* at 1297-98. Because the alleged errors were not fundamental, "appellate counsel would have been procedurally barred from [challenging them] on appeal." *Scott*, 857 F. App'x at 551. Counsel "will not be held to have performed deficiently" where, as here, he "fail[s] to perform a futile act, one that would not have gotten his client any relief."[16] *Pinkney*, 876 F.3d at 1297.

## IV. Conclusion

Accordingly, the Court **ORDERS**:

[16] Even if state-law deference did not apply, this Court would reach the same conclusion as the Florida Supreme Court with respect to fundamental error. Florida courts define fundamental error as "error that reach[es] down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." *Kilgore v. State*, 688 So. 2d 895, 898 (Fla. 1996) (internal quotation marks omitted). For the reasons explained by the Florida Supreme Court, the challenged remarks do not satisfy this demanding standard.

1. Davis's petition for writ of habeas corpus, (Doc. 1), is **DENIED**.
2. The **CLERK** is directed to enter judgment against Davis and to **CLOSE** this case.
3. Davis is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a certificate of appealability, Davis must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Davis has not made the requisite showing. Because Davis is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

**DONE AND ORDERED** in Tampa, Florida, on October 26, 2026.

**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**